## FORMOSA PLASTICS CORP., USA, Appellant,

v.

## KAJIMA INTERNATIONAL, INC., Appellee.

No. 13–02–00385–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

Dec. 28, 2006.

David R. Montpas, San Antonio, TX, for Appellant.

Steven John Lownds, Quilling, Selander, Cummiskey & Lownds, Dallas, TX, for Appellee.

## OPINION ON REHEARING EN BANC

ROGELIO VALDEZ, Chief Justice.

Appellee, Kajima International, Inc. ("Kajima"), moved for rehearing en banc of this Court's opinion issued November 10, 2004, in which the Court concluded that Formosa Plastics Corp., USA ("Formosa") met its burden to disqualify A.W. "Chip" Hutchison, Kajima's expert witness, on the basis that Hutchison's colleague, Steven Huyghe, previously consulted with Formo-

sa. *Formosa Plastics Corp., USA v. Kajima Int'l, Inc.*, No. 13–02–00385–CV, 2004 WL 2534207, 2004 Tex.App. LEXIS 9950, *15 (Tex.App.-Corpus Christi Nov. 10, 2004, no pet. h.). The Court reversed the judgment and remanded the matter for a new trial with directions that Hutchison and others from his firm would not be permitted to testify. *See id.* at *20. Justice Castillo's dissenting opinion concluded that Formosa had waived the side-switching issue, and would have affirmed the judgment of the trial court. *Id.* at *83 (Castillo, J., dissenting).

The Court has granted rehearing en banc. We withdraw our original opinion and judgment issued on November 10, 2004, and issue this opinion and accompanying judgment in their stead. On rehearing, we conclude that Formosa failed to meet its burden of proof to disqualify Hutchison, and we affirm the judgment of the trial court.

## I. Background

Kajima International Inc. ("Kajima"), an industrial construction company, submitted several bids for work on Formosa's expansion plant project located in Point Comfort, Texas. Formosa awarded Kajima five contracts, some involving piping work in the olefins area and others involving piping and equipment setting work in the polypropylene plant. Each contract specified a schedule of performance. The general terms and conditions common to all contracts permitted Kajima to work overtime only if Kajima or its subcontractors delayed the work, and, in such an event, Kajima received no additional compensation for the overtime.

Performance took much longer than provided for in the contracts, causing Kajima's costs to vastly exceed the contract amount paid by Formosa. Kajima asserts it was required to spend this money as a result of Formosa's fraudulent conduct in connection with the bidding process and its fraudulent inducement of extra-contractual work. According to Kajima, the engineering drawings for its work at the polypropylene plant were full of errors and inaccuracies, yet Formosa knowingly misrepresented the quality of the design drawings for the project during the bidding process. Kajima asserts Formosa fraudulently induced it to enter into the contracts and make artificially low bids on the contracts by withholding information relating to the design and drawings of the polypropylene plant. Kajima further asserts Formosa knowingly provided Kajima with a false schedule concerning the olefins plant which failed to reveal that multiple contractors would be working in the same location, and at the same time, as that planned by Kajima, thus preventing Kajima from executing its responsibilities under the contracts. Moreover, according to Kajima, Formosa engaged in a "string along" fraud scheme in which Formosa made repeated false promises to compensate Kajima for delays, disruptions, bid omissions, and additional costs in order to keep Kajima working. At the conclusion of the project, Kajima had spent in excess of $38 million but had received only $10 million from Formosa.

Formosa counters that Kajima spent in excess of the contract prices because of Kajima's own bidding and contract administration mistakes. Formosa asserts the drawings were adequate for building and bidding and, when problems arose, Kajima was paid pursuant to the contract. Formosa further contends that Kajima knew other contractors would be working within its area and that any conflict in scheduling was the result of Kajima's own mismanagement.

Kajima sued Formosa and Formosa Plastics Corp., Texas ("Formosa Texas") in

January 1993 for breach of contract, fraud, and quantum meruit arising from five of the construction contracts. The matter was first tried to a jury in 1997. The jury found that Formosa did not breach any of the five contracts but did fraudulently induce one of the contracts. The trial court subsequently rendered judgment for Kajima for $4,491,066.65. Kajima appealed, and this Court reversed and remanded the case for a new trial. *Kajima Int'l Inc. v. Formosa Plastics Corp., USA*, 15 S.W.3d 289, 294 (Tex.App.-Corpus Christi 2000, pet. denied).

The case was tried again in 2002. Kajima nonsuited Formosa Texas and the matter was submitted to the jury on the issue of fraud. The jury found Formosa guilty of fraud and awarded Kajima approximately $15 million dollars, or roughly 60% of the damages it sought. The trial court rendered judgment for Kajima for actual damages of $15,432,123.45, prejudgment interest of $14,210,269.65, and $403,156.86 in costs. This appeal ensued. Formosa raises nine issues on appeal.

## II. Expert Disqualification

We will first address Formosa's third issue on appeal, that is, the expert disqualification issue which the Court found determinative of the appeal in its original opinion. Formosa alleges that Kajima's expert, A.W. "Chip" Hutchison, should not have been permitted to testify. Formosa first argues that an expert retained and paid by one party cannot switch sides and testify as an expert for the opposing party in the same case. Formosa contends that the firm of A.W. Hutchison & Associates, Inc. served as Formosa's "consulting" experts and Formosa satisfied all requirements to disqualify the firm and Chip Hutchison. In contrast, Kajima contends that any information Formosa provided to Hutchison's colleague, Steven Huyghe, was

discoverable and not confidential, and no confidential information was shared with Hutchison or Huyghe. Kajima further asserts that, even if confidential information was disclosed to Huyghe, that knowledge could not be imputed to Hutchison. The factual background regarding this matter is critical to understanding and properly analyzing this issue.

When the question of litigation with Kajima first originated, Formosa retained the law firm of Jones, Day, Reavis & Pogue ("Jones Day"). Counsel for Jones Day contacted Huyghe, an expert in heavy industrial construction and president of A.W. Hutchison & Associates of California, Inc. Huyghe and an assistant met with attorneys from Jones Day and in-house counsel for Formosa. They spoke about "strategies for this case and what kind of defense we ought to establish," and "what the contentions were that Kajima had against Formosa and how we were going to answer some of those allegations." They further discussed Kajima's allegations against Formosa and which allegations might be true or were not true. Huyghe was to assist in document review and organization in order to "see what we had." The Formosa attorneys never requested that Huyghe maintain confidentiality regarding these conversations or documents, nor did they request that he execute any confidentiality agreement.

Huyghe reviewed and organized documents that had been produced by Formosa to Kajima and documents produced from Kajima to Formosa. He prepared a work plan outlining his proposed method for evaluating the situation as well as an index of relevant documents received from Kajima.

Huyghe sent several letters to Jones Day and copied some of those letters to Hutchison, his colleague at A.W. Hutchison & Associates, Inc., in Atlanta, a sepa-

rate but related corporation from that which employed Huyghe.[1]

The first of these letters, dated June 14, 1993, discussed the consulting group's "possible involvement" in the litigation, provided examples of prior work, and mentioned that Hutchison was available for a meeting "if you so desire." A letter dated October 19, 1993, discussed what A.W. Hutchison & Associates had done for clients in the past and explained the methodology usually employed to evaluate problems. This letter was marked as "privileged and confidential." Huyghe also provided a letter agreement for the engagement of the group and included a proposed confidentiality agreement, which Formosa's attorneys never signed.

In late 1993, Formosa transferred its defense from Jones Day to the law firm of Porter & Hedges. The Porter & Hedges attorneys received Huyghe's proposed work plan and the index of documents from Kajima, but decided not to employ Huyghe's services. On April 6, 1994, Porter & Hedges told Huyghe to consider himself "indefinitely on hold." By this point, Huyghe had submitted bills totaling approximately $22,000 for more than 167 hours of work. On April 15, 1994, Huyghe contacted Porter & Hedges and, detailing his group's work on prior cases, requested an opportunity to meet with Formosa's attorneys to present his thoughts on the case. Porter & Hedges failed to accept this invitation.

A few months later, Kajima's attorney approached Huyghe about consulting with Kajima in the lawsuit. Huyghe informed the attorneys at Jones Day, who suggested contacting Porter & Hedges about this possibility and any potential conflicts of interest. Apparently Huyghe did not con-

tact the new attorneys. Huyghe did sign a "conflict certification" affidavit provided by Kajima, in which he certified that "A.W. Hutchison & Associates, Inc., has not received any confidential information from any Formosa entity or from its counsel." Kajima did not hire Huyghe; however, it did hire both Chip Hutchison and Brian Rogers of A.W. Hutchison & Associates, Inc. in Atlanta, Georgia.

At the trial, Huyghe testified that he had not received any confidential information from Formosa. In contrast, an attorney for Jones Day testified that she had revealed confidential information, including settlement strategies, to Huyghe. Nevertheless, Jones Day admitted that it had not made a determination regarding whether Huyghe would be utilized as a testifying expert.

Huyghe testified that he had never discussed any Formosa-related information with Hutchison or Rogers. Counsel for Jones Day testified that the lawyers at the firm had no communications with Hutchinson or Rogers, did not disclose any information to Hutchinson or Rogers, and knew of no confidential information that was ever disclosed from Formosa to Hutchinson or Rogers. Counsel also knew of no contact with Jones Day and Hutchinson in Atlanta. Hutchison himself testified that he had no knowledge of any Formosa-related information known to Huyghe.

On the basis of this lack of disclosure, the trial court denied Formosa's motion to disqualify Hutchison and Rogers from testifying, and the jury subsequently awarded a verdict in favor of Kajima.

The chief issues before this Court are: (1) what guidelines should have framed the

---

**1.** Prior to the trial of this matter, Hutchison's corporation, A.W. Hutchison & Associates, Inc., merged with A.W. Hutchison & Associ-ates of California, Inc., which employed Huyghe.

trial court's decision whether to disqualify Hutchison and A.W. Hutchison and Associates ("AWH"); and (2) whether the trial court's decision was properly executed within those guidelines. Any question about an expert's breach of his or her duties, fiduciary or otherwise, to a former client is not at issue here. Likewise, the hypothetical question of whether Huyghe should have been disqualified is not before the Court, nor is the hypothetical question of whether disqualification and other sanctions would have been appropriate if Hutchison and Huyghe were lawyers and not engineering experts.

We write separately on this issue on rehearing en banc for the following reasons. The Court's dissenting opinion on rehearing adopts the two-part expert disqualification test outlined in *Koch Ref. Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir.1996). While we do not disagree with the dissent's utilization of this test, and, in fact, would apply the same basic test with additional factors utilized by other courts, we diverge from the dissent insofar as it concludes that Formosa met its burden for disqualification under this standard. That is, the dissent states that it was objectively reasonable for Formosa to believe that it had a confidential relationship with Hutchison and confidential information was disclosed to Hutchison. We conclude otherwise. The concurring opinion on rehearing asserts that Formosa waived its right to seek disqualification of Hutchison and AWH because Formosa failed to assert a claim of confidentiality over information imparted to Huyghe, and would affirm the judgment below. Rather than finding waiver, as does the concurrence, we conclude simply that Formosa has failed to meet its initial burden to show that disqualification is necessary.

Thus, we turn to the issue currently before the Court, that is, the disqualification of a non-attorney expert witness based on another expert's work for the opposing party. We will also examine the expert's contacts with the opposing party in the litigation. While the issue of expert disqualification in terms of an expert's relationship with a law firm has been tangentially discussed in opinions by the Texas Supreme Court and other appellate courts, the issue at hand is one of first impression. *See, e.g., In re Am. Home Prods. Corp.*, 985 S.W.2d 68, 73 (Tex.1998) (orig.proceeding) (considering disqualification of counsel for plaintiffs because of their retention of testifying expert who had previously worked as consulting expert for defendant in the same litigation); *In re Bell Helicopter*, 87 S.W.3d 139, 151 (Tex.App.-Fort Worth 2002, orig. proceeding) (considering disqualification of law firm because of its retention of consulting expert who had previously worked for defendant in the same litigation). More specifically, the issues of first impression we must address are: (1) whether an expert should be disqualified where he was retained by one side but was somehow related to an expert previously retained by the opposing party; and (2) whether the entire firm of experts to which both of these experts belong should be disqualified.

■■■■ We first must decide the appropriate standard of review. In general, we review the trial court's decision to admit or exclude expert evidence for an abuse of discretion. *State Farm Fire & Cas. Co. v. Rodriguez*, 88 S.W.3d 313, 318 (Tex.App.-San Antonio 2002, pet. denied); *see Guadalupe–Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 810 (Tex.2002). We see no reason not to apply this standard herein even though this matter turns not on qualifications or reliability, but rather on an alleged conflict of interest. We reverse

based on the erroneous admission or exclusion of evidence only if the appellant shows error that was calculated to cause and probably did cause the rendition of an improper judgment. Tex.R.App. P. 44.1(a); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex.1995); *Doncaster v. Hernaiz*, 161 S.W.3d 594, 601 (Tex.App.-San Antonio 2005, no pet.) ("error on questions of evidence is generally not reversible unless the appellant can show that the whole case turns on the particular evidence admitted or excluded"). We note that disqualification is a drastic measure that courts should impose only "hesitantly, reluctantly, and rarely." *Owen v. Wangerin*, 985 F.2d 312, 317 (7th Cir.1993); *Koch Ref. Co.*, 85 F.3d at 1181; *Hewlett–Packard Co. v. EMC Corp.*, 330 F.Supp.2d 1087, 1092 (N.D.Cal.2004); *United States v. Salamanca*, 244 F.Supp.2d 1023, 1025 (D.S.D. 2003); *Proctor & Gamble Co. v. Haugen*, 184 F.R.D. 410, 413 (D.Utah 1999); *Palmer v. Ozbek*, 144 F.R.D. 66, 67 (D.Md.1992).

██ When disqualification based on a prior relationship with an adversary is requested, the majority of courts have adopted a two-prong test which balances the competing interests of the parties. *See W. Va. ex rel. Billups v. Clawges*, 620 S.E.2d 162, 167, 218 W.Va. 22 (2005) (collecting cases); *Mitchell v. Wilmore*, 981 P.2d 172, 175 (Colo.1999). Under the test, disqualification is warranted if: (1) the moving party possessed an objectively reasonable basis to believe that a confidential relationship existed between that party and the expert witness; and (2) confidential or privileged information was in fact provided to the expert by the moving party. *See Koch Ref. Co.*, 85 F.3d at 1181; *Hewlett–Packard Co.*, 330 F.Supp.2d at 1093.[2] In the usual case, both factors

must be present to merit disqualification. *See Hewlett–Packard*, 330 F.Supp.2d at 1093 (explaining that if only one of the factors is present, disqualification is likely inappropriate). Other courts also apply additional factors, sometimes generally spoken of in such general terms as "fundamental fairness" and "prejudice." These courts consider and weigh competing policy considerations, whether disqualification would be fair to the affected party or would be unduly prejudicial, whether disqualification would promote the integrity of the judicial process, and whether the public has an interest in allowing or not allowing the expert to testify. *See Grioli v. Delta Int'l Mach. Corp.*, 395 F.Supp.2d 11, 13 (E.D.N.Y.2005) (citing cases); *Hewlett–Packard Co.*, 330 F.Supp.2d at 1094–95 (citing cases). As stated in *Hewlett–Packard*:

> It is important to consider other policy concerns in order to achieve the goal of protecting the integrity of the adversary process and of promoting public confidence in the legal system. Such concerns include consideration of the parties' strategic positions ... and avoidance of creating 'troublesome incentives for both experts and the retaining party.' For example, if experts are permitted to breach confidentiality agreements, they might be motivated 'to sell their opinions to the opposing parties or the highest bidder without concern about the potential confidentiality of their previous consultations. The retaining party might be motivated 'not to withdraw a previously designated expert while litigation is pending for fear that the party's confidential information would become available to its adversary.' However, if 'experts are too eas-

---

**2.** This two-part test was first set forth in *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 278 (S.D.Ohio 1988), and later framed by *Wang Laboratories, Inc. v. Toshiba Corp.*, 762 F.Supp. 1246, 1248 (E.D.Va.1991).

ily disqualified, unscrupulous attorneys may attempt to create relationships with numerous potential experts at a nominal fee hoping to preempt the ability of their adversaries to obtain expert assistance.'

*Hewlett–Packard Co.,* 330 F.Supp.2d at 1095 (internal citations omitted).

■■■ Under this test, the moving party bears the burden of demonstrating that disqualification is necessary. *Grioli,* 395 F.Supp.2d at 14; *Hewlett–Packard Co.,* 330 F.Supp.2d at 1096. The party seeking disqualification bears the burden of establishing both the existence of confidentiality and its nonwaiver. *United States ex rel. Cherry Hill Convalescent Ctr., Inc. v. Healthcare Rehab Sys., Inc.,* 994 F.Supp. 244, 249 (D.N.J.1997); *Cordy v. Sherwin–Williams Co.,* 156 F.R.D. 575, 580 (D.N.J. 1994).

■■■ In evaluating the first prong of the test, that is, whether there was an objectively reasonable basis to believe that a confidential relationship existed with the expert, courts have considered various factors, including:

(1) whether the relationship was one of long standing and involved frequent contacts instead of a single interaction ·with the expert;

(2) whether the parties entered into a formal confidentiality agreement;

(3) whether the expert was asked to agree not to discuss the case with the opposing parties or counsel;

(4) whether the expert derived any of his specific ideas from work done under the direction of the retaining party;

(5) the number of meetings between the expert and the attorneys;

(6) whether the party retained the expert to assist in litigation;

(7) whether the expert was paid a fee;

(8) whether work product was discussed or documents were provided to the expert;

(9) whether alleged confidential communications were from expert to party or vice versa;

(10) whether the moving party funded or directed the formation of the opinion to be offered at trial; and

(11) the extent to which the expert learned of the party's litigation strategies.

*Lacroix v. Bic Corp.,* 339 F.Supp.2d 196, 200 (D.Mass.2004); *Hewlett–Packard,* 330 F.Supp.2d at 1093; *Stencel v. Fairchild Corp.,* 174 F.Supp.2d 1080, 1083 (D.Ca. 2001); *Mayer v. Dell,* 139 F.R.D. 1, 3 (D.D.C.1991); *Paul v. Rawlings Sporting Goods Co.,* 123 F.R.D. 271, 280 (S.D.Ohio 1988). A long-term relationship is more likely to exist when the "record supports a longstanding series of interactions, which have ... coalesced to create a basic understanding of the retaining party's modus operandi, patterns of operation, and decision-making process." *Hewlett–Packard,* 330 F.Supp.2d at 1093 (quoting *Marvin Lumber & Cedar Co. v. Norton Co.,* 113 F.R.D. 588, 591 (D.Minn.1986)). Conversely, informal consultations occur when the expert received no insight into the present litigation strategy. *Id.* In examining this prong of the test, the emphasis is not on whether the expert was retained per se, but whether there was a relationship that would permit the litigant to reasonably expect that any communications would remain confidential. *Id.; Lacroix,* 339 F.Supp.2d at 200 (D.Mass.2004).

■■■ Confidential information is information "of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of attorney-client privilege." *Hewlett–Packard,* 330 F.Supp.2d at 1093 (cita-

tions omitted). It could include discussion of the party's strategy in the litigation, the kinds of experts the party expects to retain, the party's view of the strengths and weaknesses of each side, the role of each of the experts to be hired, and anticipated defenses. *Id.* at 1094; *Lacroix*, 339 F.Supp.2d at 201. Communication based upon technical information, as opposed to legal advice, is not considered privileged, *Nikkal Indus., Ltd. v. Salton, Inc.*, 689 F.Supp. 187, 191–92 (S.D.N.Ý.1988), nor is information that is routinely discoverable. *In re Mitchell*, 981 P.2d at 176; *Palmer v. Ozbek*, 144 F.R.D. 66, 68 (D.Md.1992). Unlike attorney-client communications, discussions between parties or counsel and experts do not carry the presumption that confidential information was exchanged. *Hewlett–Packard*, 330 F.Supp.2d at 1094; *Nikkal Indus., Ltd.*, 689 F.Supp. at 191–92. Because the burden is on the party seeking disqualification, that party should point to specific and unambiguous disclosures that, if revealed, would prejudice the party. *Hewlett–Packard*, 330 F.Supp.2d at 1094.

In urging this Court to disqualify Hutchison and AWH, Formosa cites authority regarding the disqualification of legal personnel and law firms and suggests that Hutchison and AWH should be disqualified in this case under the same rules that prevent an attorney from representing an adversary against a former client. While the rationale for disqualifying an expert is similar to that for disqualifying an attorney who has a conflict of interest, the two situations are distinguishable and

subject to different standards. *See Grioli*, 395 F.Supp.2d at 13; *In re Ambassador Group, Inc., Litigation*, 879 F.Supp. 237, 241 (E.D.N.Y.1994). Unlike attorneys, expert witnesses generally serve as sources of information and not necessarily as recipients of confidences. *See, e.g., English Feedlot v. Norden*, 833 F.Supp. 1498, 1501 (D.Colo.1993) ("The expert disqualification standard must be distinguished from the attorney-client relationship because experts perform very different functions in litigation than attorneys."); *Paul*, 123 F.R.D. at 281 (stating that attorneys occupy "a position of higher trust, with concomitant fiduciary duties, to a client than does an expert consultant"). The majority of courts that have considered the issue of expert disqualification have applied different standards from those used when reviewing the disqualification of an attorney. This approach is well-reasoned and we adopt it. Accordingly, the Court will not apply the stringent attorney-client conflict standards in determining whether Kajima's expert in this case should be disqualified.

Applying the foregoing principles to the instant case, it seems clear that Huyghe would be disqualified from representing Kajima, if indeed that were the issue currently before us. It was objectively reasonable for Formosa to conclude that a confidential relationship existed between Huyghe and Formosa, and the evidence before the trial court would have supported the conclusion that confidential or privileged information was disclosed to Huyghe.[3] This would be a clear-cut case

**3.** According to testimony from counsel with Jones Day, the firm had not yet made a decision regarding whether it would designate Huyghe as a testifying expert or utilize him as a consulting expert when meeting with Huyghe. The law is abundantly clear that the subject matter on which an expert witness is expected to testify, the mental impressions and opinions held by the expert and the facts known to the expert (regardless of when the factual information was acquired) which relate to or form the basis of the mental impressions and opinions held by the expert, are discoverable. *See* Tex.R. Civ. P. 166b(2)(e); *see also* Tex.R. Civ. P. 166b(3)(b); *In re Am. Home Prods. Corp.*, 985 S.W.2d 68, 73 (Tex.

of side-switching that would immediately merit disqualification. *See Koch*, 85 F.3d at 1181.

 However, the issue currently before the Court is not the disqualification of Huyghe, but whether the trial court abused its discretion in refusing to disqualify Hutchison. We hold that Formosa failed to meet its burden to meet either prong of the *Koch* test: (1) that it was objectively reasonable for Formosa to conclude that it had a confidential relationship with Hutchison; or (2) confidential or privileged information was in fact provided to Hutchison by either Formosa, as the moving party, or Huyghe, his colleague at AWH.

Based on our review of the record evidence, it was not objectively reasonable for Formosa to conclude that it had a confidential relationship with Hutchison. Formosa did not have a prior relationship with Hutchison and never met, corresponded, or spoke with him about this litigation. Although Huyghe told Formosa that Hutchison was available to work on the Kajima case, Hutchison did not perform any work for Formosa on this matter, in coordination with Huyghe or otherwise. Accordingly, disqualification is not warranted. *See Hewlett–Packard*, 330 F.Supp.2d at 1093.

 Insofar as Formosa's motion to disqualify sought the disqualification of the entire consulting group of AWH, we have previously determined that the disqualification rules applicable to attorneys, which would allow for disqualification of a firm based on imputed knowledge, should be inapplicable to expert witnesses. *See Stencel*, 174 F.Supp.2d at 1083; *United States ex rel Cherry Hill Convalescent*

*Ctr., Inc.*, 994 F.Supp. at 249. Accordingly, we do not find that Formosa had a confidential relationship with AWH, or that Formosa had a confidential relationship with Hutchison merely by virtue of Hutchison's association with Huyghe or Huyghe's consulting group.

Moreover, even if we were to conclude that it was objectively reasonable for Formosa to believe that it had a confidential relationship with Hutchison, there remains no showing regarding the second prong of the *Koch* test, that is, that any confidential or privileged information was disclosed to Hutchison by either Jones Day or Huyghe. Saliently, none of the trial witnesses testified that they disclosed confidential information to Hutchison. We have closely examined the written communications that Huyghe sent to Formosa and copied to Hutchison, and we see no signs therein of privileged or confidential information. These communications consisted primarily of marketing efforts, budget estimates, and proposals for work. In fact, at the stage of the litigation when those letters were sent, Huyghe's work on the case was clearly in its infancy and additional work remained to be done.

 We conclude that Formosa failed to meet its burden under the two-prong test for disqualification articulated by the Fifth Circuit in *Koch. See Koch Ref. Co.*, 85 F.3d at 1178. However, in considering the issue of disqualification, we also consider additional factors, including the competing policy considerations, applicable to the requested disqualification. Based on the record before the Court, the trial court's decision not to disqualify Hutchison and AWH was neither prejudicial nor fundamentally unfair to either of the parties.

1998). Discoverable information is not, by definition, "confidential information" as con-

templated by the *Koch* test.

The policies of allowing experts to pursue their trade, allowing parties to select their own experts, and preventing gamesmanship, whereby parties create conflicts solely for the purposes of preventing their adversary from using the services of the expert, outweigh the policy of preventing conflicts under the particular factual circumstances present in the instant case. Formosa has not clearly identified any prejudice it has suffered from Kajima's retention of Hutchison or AWH. In contrast, Kajima clearly would suffer hardship if Hutchison were now disqualified at this stage of the litigation. In considering concepts of fundamental fairness and prejudice, prejudice is particularly likely at a late stage in the litigation, at which time disqualification is more likely to disrupt the judicial proceedings. *Hewlett–Packard*, 330 F.Supp.2d at 1095. In the instant case, the matter has now twice been to trial, and accordingly, Kajima would be prejudiced by Hutchison's disqualification.

Formosa bore the burden of proof with respect to the disqualification of Hutchison and AWH, and we conclude that it failed to sustain that burden. *Koch Ref. Co.*, 85 F.3d at 1181; *Hewlett–Packard*, 330 F.Supp.2d at 1095–96. Because of this conclusion, we need not address the issue of waiver as discussed by the concurrence. Accordingly, we overrule Formosa's third issue insofar as it relates to disqualification.

■■■ In a subissue, Formosa contends that the trial court abused its discretion by failing to exclude Hutchison's testimony regarding damages because the testimony was not reliable. According to Formosa, Hutchison's damage testimony was based on his own "Hutchison Method,"[4] also known as the "as-released method," which has no support in law or within the construction industry. Kajima contends, in response, that Hutchison's opinions were both relevant and reliable.

■■■ An expert witness may testify regarding scientific, technical, or other specialized subjects if the expert is qualified and if the expert's opinion is relevant and based on a reliable foundation. Tex.R. Evid. 702; *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex.1995). In determining whether expert testimony is reliable, a court should examine "the principles, research, and methodology underly-

---

**4.** The party seeking to exclude the expert's testimony must offer more than mere argument; it must offer some proof of the alternative methodologies or proof of the weakness of the methodology used:

GM's lawyers lampoon the methods Syson used to test the sun visor and to reach conclusions about the engineering compromises that would optimize a sun visor's performance in light of the risks involved. But their *cri de coeur* is not backed up by references to any body of scientific knowledge. What tests do engineers use to resolve questions of the kind Syson addressed? What tests should he have performed? What data did he overlook? Counsel apparently want appellate judges to make *a priori* judgments about how scientific inquiry should be conduct-

ed. That way quackery lies. A profession resolves questions of method in the same way it reaches conclusions about other empirical issues; which method is best is a question itself subject to scientific inquiry.... A litigant that wants a court of appeals to set aside a district judge's decision to admit expert testimony has to do more than appeal to a lawyer's sense of how science should be done.

*DePaepe v. GMC*, 141 F.3d 715, 720 (7th Cir. 1998); *see also Zenith Elecs. Corp. v. WH–TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir.2005) (noting that *Daubert* analysis "will not do to stop with lawyers' arguments pro and con, for these may fail to appreciate the difficulties that bona fide experts encounter. Scientific decisions must be made by scientific rather than rhetorical means.").

ing an expert's conclusions." *Mack Trucks v. Tamez,* 206 S.W.3d 572, 578 (Tex.2006) (quoting *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex.2002)). When the testimony involves scientific knowledge, the expert's conclusions must be based on the methods and procedures of science, or the testimony is "no more than 'subjective belief or unsupported speculation.'" *Robinson,* 923 S.W.2d at 557 (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). We apply certain non-exclusive factors to examine the reliability of expert testimony based on scientific knowledge, but these factors may not apply when testimony involves technical or other specialized knowledge. *Mack Trucks,* 206 S.W.3d at 578; *see Gammill v. Jack Williams Chevrolet,* 972 S.W.2d 713, 726 (Tex.1998) (listing factors). The Supreme Court in *Kumho Tire Co. v. Carmichael* suggested that the *Daubert* standard is a flexible one, and that the trial court should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). When the expert testimony is based on technical or other specialized knowledge, there must be some basis for the opinion to show its reliability. *Gammill,* 972 S.W.2d at 726. And, there cannot be too great an "analytical gap" between the data and the expert opinion offered. *Id.*

Formosa does not challenge Hutchison's qualifications or the relevance of his opinions, but instead focuses solely on the reliability of Hutchison's expert testimony insofar as it allegedly was based on the "as-released" method to quantify damages. Based on our review of the instant trial record, we conclude that Hutchison's testimony did not include the criticized "as-released method" for calculating damages. The "as-released" method relates to delay causation, and Hutchison's opinion testimony was not based on the causation of delays, but rather, was limited to valuation of the work performed by Kajima. Hutchison's testimony regarding the calculation of the reasonable value of the work performed by Kajima was objectively verifiable and was based on unit pricing and quantities and utilized standard estimating techniques. Formosa does not offer any criticism relevant to this testimony. Accordingly, we conclude that Formosa's attack on the reliability of Hutchison's testimony was misplaced, and Formosa's subissue on this subject is overruled. We overrule Formosa's third issue.

### III. Fraud Damages

In its first issue, Formosa argues that the evidence is legally and factually insufficient to support the jury's award of fraud damages. According to Formosa, a rational basis must exist for a damages finding.

The trial court's charge asked the jury to determine Kajima's fraud damages and instructed the jury to consider "[t]he difference, if any, between the reasonable value (excluding any profit) of Kajima's work it performed for Formosa and what Kajima was paid." The jury awarded Kajima $15,432,123.45.

Juries have broad discretion in assessing damages where the law provides no precise legal measure; a jury's findings will not be disregarded merely because its reasoning in arriving at its figures may be unclear, so long as a rational basis for its calculation exists. *McMillin v. State Farm Lloyds,* 180 S.W.3d 183, 201 (Tex. App.-Austin 2005, no pet.); *Swank v.*

*Sverdlin,* 121 S.W.3d 785, 799 (Tex.App.-Houston [1st Dist.] 2003, pet. denied); *First State Bank v. Keilman,* 851 S.W.2d 914, 930 (Tex.App.-Austin 1993, writ denied).

Formosa argues that the record is devoid of any evidence supporting the jury's award of $15,432,123.45 and that the numerical sequencing of the finding shows that the award was randomly chosen and not based on the evidence before the jury. Formosa argues that this case is identical to that considered by the Austin Court of Appeals in *First State Bank v. Keilman,* 851 S.W.2d 914 (Tex.App.-Austin 1993, writ denied). In *Keilman,* the plaintiffs brought a usury claim against First State Bank, arguing that they were charged $7,161.44 in unauthorized interest. *See id.* at 931. The bank submitted evidence that it did not charge unauthorized interest. *Id.* The jury heard evidence that damages were either $7,161.44 or zero, yet awarded $360. *Id.* at 929. The Austin Court held that no evidence supported this award, as it was "inexplicable in light of the evidence" and "it appeared that the jury pulled a number out of a hat." *Id.* at 931.

In the instant case, Kajima asked the jury to award it $25,307,287. In contrast, Formosa argued that the jury should award Kajima nothing. However, this is not a situation, as in *Keilman,* where there were only two possible answers to the damage question. The evidence before the jury did not present a situation where damages could be calculated based on only two possible choices. That is to say, "[r]ather than a binary choice or a series of binary choices, this evidence presented the jury with a range of possible awards." *McMillin,* 180 S.W.3d at 203. The fact that the jury chose neither the figure requested by Kajima nor the figure suggested by Formosa does not invalidate the award.

Formosa supports its argument as to the randomness of the award by pointing to a question from the jury. During deliberations, the jury sent a note to the trial court asking: "Judge, in question number two, are we to base our answer on the amount that is owed, 25.3 million, or how much they deserve." In response, the trial court referred the jury back to the jury charge. Formosa contends that the jury inappropriately chose to award an amount that it believed Kajima deserved rather than follow the instructions given to it. Again, we disagree. The question from the jury regarding how much Kajima deserved equates to the reasonable value, excluding profit, of its work.

We conclude that the evidence here was sufficient to enable reasonable jurors to choose from a range of possible damage awards that included the $15,432,123.45 amount ultimately awarded. Kajima's expert, Hutchison, testified regarding the damages suffered by Kajima. Hutchison first calculated the total costs incurred by Kajima to be $38,717,854. He then subtracted $3,330,574 from that figure, as costs that did not provide value to Formosa, thus arriving at $35,387,380, as representing the reasonable value of the work performed by Kajima. Hutchison then subtracted $10,000,000 as the amount paid by Formosa. Kajima argued that the resulting figure, $25,387,380, represented the difference in value between what was given by Kajima and what was paid by Formosa.

In contrast, Formosa argued that Kajima's figure should be reduced because of wasted labor that did not add value for Formosa. Mike Holloway, a Formosa field supervisor, specifically testified that half of all labor spent by Kajima was wasted. Other testimony attacked Kajima's productivity and work methodology.

In the case before us, the testimony of the witnesses and experts was lengthy and detailed. The evidence regarding damages contained many components to be considered and disparate estimates of values to be assigned to each. *See Aboud v. Schlichtemeier*, 6 S.W.3d 742, 749 (Tex. App.-Corpus Christi 1999, pet. denied). The damages awarded by the jury were well within the range of evidence. This evidence supplied a basis for the jury to rationally ascertain the value of work performed by Kajima and what Kajima was paid. We hold that there is legally and factually sufficient evidence to support the jury's finding in regard to actual damages. We overrule Formosa's first issue.

## IV. Charge Error

In its second issue, Formosa contends that the trial court's submission of a single broad-form liability question is reversible error. In this case, the jury was asked, "Did Formosa commit fraud against Kajima?" Formosa argues that the charge should have provided separate answer blanks for each of the five contracts at issue in this case. Formosa contends that the failure to include separate answer blanks for each contract makes it impossible to trace the jury's damage award back to any specific contract or contracts and prevents Formosa from challenging the sufficiency of the evidence as to any of the individual contracts.

■ We are required to order a new trial under *Crown Life Insurance Co. v. Casteel* when "a single broad-form liability question incorporates multiple theories of liability" in such a way that we "cannot determine whether the jury based its verdict on an improperly submitted invalid theory." *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex.2000).

■ We disagree with Formosa's argument. *Casteel* applies to multiple theories of liability; by contrast, the instant situation involves only one—fraud. Contrary to Formosa's contention, *Casteel* does not require a granulated submission as to multiple acts under a single theory of liability.[5] *See id.* Moreover, I would note that the error of including a factually unsupported claim in a broad-form jury question is not always reversible. *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 227 (Tex.2005). To be reversible, the erroneous instruction must have "probably prevented the appellant from properly presenting the case to the court of appeals." *See* TEX.R.APP. P. 44.1(a)(2); *Romero*, 166 S.W.3d at 227. Here, the underlying conduct upon which the jury found liability was essentially the same for all five of the contracts at issue. On this record, we are "reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it." *See Romero*, 166 S.W.3d at 227–28. Consequently, even if *Casteel* applied in the instant analysis, we would have found that any error in the jury instruction was harmless. We overrule Formosa's second issue.

## V. Ratification

■ In its fourth issue, Formosa argues that the trial court erred by refusing to submit its requested issue on ratification to the jury. According to Formosa, it pleaded and properly requested a jury

---

**5.** If Formosa's misinterpretation of *Casteel* were correct, even a simple car wreck case would require a granulated submission of whether the defendant driver was negligent in failing to keep a proper lookout, negligent in failing to maintain a safe speed, negligent in failing to remain in the proper lane of traffic, negligent in steering, negligent in failing to apply the brakes, etcetera. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000).

submission on ratification and there was ample evidence to support an issue on ratification. Ratification is a plea in avoidance and thus an affirmative defense which, absent trial by consent, is waived unless affirmatively pleaded. *Land Title Co. v. F.M. Stigler, Inc.,* 609 S.W.2d 754, 756 (Tex.1980).

■■■ A person ratifies an unauthorized act if, by word or conduct, with knowledge of all material facts, he confirms or recognizes the act as valid. *Miller v. Kennedy & Minshew,* 142 S.W.3d 325, 342–43 (Tex.App.-Fort Worth 2003, pet. denied); *Mo. Pac. R.R. Co. v. Lely Dev. Corp.,* 86 S.W.3d 787, 792 (Tex.App.-Austin 2002, pet. dism'd). Ratification need not be shown by express word or deed but may be inferred by a course of conduct. *Miller,* 142 S.W.3d at 342–43; *Mo. Pac. R.R. Co.,* 86 S.W.3d at 792.

■■■ In *Fortune Production Co. v. Conoco, Inc.,* 52 S.W.3d 671 (Tex.2000), the Texas Supreme Court held that a party who does not have a continuing obligation to perform under a contract, but nevertheless continues to perform after learning of a fraud, ratifies the fraud and therefore cannot recover damages for the period of time when the party knew of the fraud. *Id.* at 680; *see Meyer v. Cathey,* 167 S.W.3d 327, 331 (Tex.2005). A party may ratify an agreement induced by fraud in such a way that both the right to rescind and a claim for damages are foreclosed, although ratification can also be in such a way that loss of the right to rescind the contract occurs without loss of the right to sue for damages. *See Fortune Prod. Co.,* 52 S.W.3d at 677–78; *Harris v. Archer,* 134 S.W.3d 411, 428 (Tex.App.-Amarillo 2004, pet. denied).

■■■ It is well established that litigants have a right to a fair trial before a jury that is properly instructed on the issues authorized and supported by the law governing the case. *Harris County v. Smith,* 96 S.W.3d 230, 234 (Tex.2002). "If an issue is properly pleaded and is supported by some evidence, a litigant is entitled to have controlling questions submitted to the jury." *Triplex Comm. v. Riley,* 900 S.W.2d 716, 718 (Tex.1995); *see* Tex.R. Civ. P. 278; *see also Elbaor v. Smith,* 845 S.W.2d 240, 243 (Tex.1992).

■■■ The trial court has broad discretion in submitting jury questions and instructions. *Plainsman Trading Co. v. Crews,* 898 S.W.2d 786, 791 (Tex.1995). "Failure to submit a question shall not be deemed a ground for reversal of the judgment unless a substantially correct question has been requested in writing and tendered by the party complaining of the judgment." Tex.R. Civ. P. 278. When a trial court refuses to submit a proper question or instruction, reversal is not required unless the error probably caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1; *Union Pac. R.R. Co. v. Williams,* 85 S.W.3d 162, 170 (Tex. 2002).

Formosa argues that evidence supporting the submission of ratification includes a meeting in March of 1992, at which Kajima's management realized it would lose $25 million unless it walked off the job. Formosa unilaterally characterizes this evidence as proof that, "[b]y recognizing its right to cancel the contracts, Kajima acknowledged the alleged fraud. Nevertheless, Kajima chose to go forward under the contracts, even though it knew that it would cost $25 million to complete the contracts. This is ratification." Yet Formosa offers neither any proof nor any argument which would explain how the evidence of Kajima's March 1992 meeting would possibly qualify as ratification in light of Kajima's evidence of Formosa's contemporaneous and even subsequent

promises of compensation for delays, disruptions, and bid omissions offered to induce Kajima to remain on the job. In the same vein, Formosa also argues that Kajima knew of alleged misrepresentations regarding the CTCI drawings, yet continued to perform under the CM903 contract. Formosa also argues that Kajima knew of fraud regarding the LM905 and LM910 contracts, that is, that Kajima knew that other contractors were behind schedule and were congesting Kajima's work area, both before signing the contracts and before beginning construction.

We reject Formosa's view of the evidence and the law of ratification. Formosa has not presented evidence that Kajima acted with "full knowledge of the fraud and of all material facts." *Fortune Prod. Co.*, 52 S.W.3d at 677. Nor has Formosa adduced evidence that Kajima showed "the intention, clearly manifested, of abiding by the affirmance of the contract" or evidence of acts that indicated Kajima's intention to waive the fraud. *See id.* Accordingly, we overrule Formosa's fourth issue.

## VI. Exclusion of Evidence

In its fifth issue, Formosa contends that the trial court committed reversible error when it prevented Formosa from submitting evidence that Kajima's damages were not caused by fraud. Formosa argues that the trial court excluded evidence that Kajima omitted "millions of dollars worth of items from its bids" and also excluded other testimony showing that Kajima's damages were self-inflicted and were not proximately caused by any alleged fraud on Formosa's part.

▬▬ Whether to admit or exclude evidence is a matter committed to the trial court's sound discretion. *See City of Brownsville*, 897 S.W.2d at 753; *Bic Pen Corp. v. Carter*, 171 S.W.3d 657, 676 (Tex. App.-Corpus Christi 2005, pet. granted).

To reverse a judgment based on a claimed error in admitting or excluding evidence, a party must show that the error probably resulted in an improper judgment. Tex. R.App. P. 44.1(a); *Alvarado*, 897 S.W.2d at 753. In determining if the excluded evidence probably resulted in the rendition of an improper judgment, we review the entire record. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *Id.* We will not reverse a judgment because a trial court erroneously excluded evidence when the evidence in question is cumulative and not controlling on a material issue dispositive to the case. *Id.*

▬▬ We conclude that the excluded evidence was both irrelevant and cumulative of other evidence adduced at trial. Evidence regarding items omitted from Kajima's bid is irrelevant in a fraud case involving an out-of-pocket measure for damages. *See Formosa Plastics Corp., USA v. Presidio Eng'rs. & Contractors*, 960 S.W.2d 41, 49 (Tex.1998). Moreover, the excluded evidence was cumulative insofar as several witnesses testified regarding Kajima's bids and the omissions from the bids. Other excluded evidence, such as the alleged mismanagement, bribery, and theft by one of Kajima's managers, was also irrelevant to the ultimate issue regarding whether or not Formosa committed fraud.

Formosa's entire defense of the case centered on Kajima's alleged mismanagement of the project causing self-inflicted loss. In the context of Formosa's entire defense, we cannot agree that exclusion of the evidence caused an improper verdict. Accordingly, we overrule Formosa's fifth issue.

## VII. Out of Pocket Losses

In its sixth issue, Formosa alleges that Kajima's out-of-pocket loss could not have exceeded half of what the jury awarded, and the trial court erroneously refused to admit evidence of Kajima's self-inflicted losses and to instruct the jury on mitigation.

■ There are two measures of damages for fraud. They are the benefit-of-the-bargain measure and the out-of-pocket measure. *See id.* Benefit-of-the-bargain damages are the difference between the value as represented and the value received. *Id.* Out-of-pocket damages compensate a defrauded party for the difference between the value of that with which he or she has parted and the value actually received. *Id.*

The damages question at issue asked the jury to determine Kajima's out-of-pocket measure of damages—one of the two recognized damage models for fraud. *See id.* Formosa contends that under this measure the relevant figures, the value paid and the value received, were established at the time the contracts were signed. *See Arthur Andersen v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex.1997). Formosa contends that Hutchison testified that the value of Kajima's work "under normal conditions," that is, the value of what Kajima contracted to provide when the relevant contracts were signed, was approximately $17 million dollars. The value that Formosa agreed to pay Kajima was $10 million dollars. Formosa thus argues that the evidence establishes that, at most, Kajima's out-of pocket loss was the difference between these two values, a figure somewhere between $7 million and $8 million.

■ We disagree with the basis for Formosa's contention. As an initial matter, the *Arthur Andersen* construct, which measures damages at the time the contract

is signed, applies to a purchase and sale of a business. *See id.* As such, it is inapplicable to a construction contract. Even if it did apply, however, we would not apply it to a contract for services wherein the evidence showed "string-along" fraud arising after execution of the contracts, as the evidence in this case establishes. A damage analysis focusing solely on the date that the contract was executed would omit damages attributable to post-contract fraud. *See Kajima,* 15 S.W.3d at 293–94.

■ There is evidence to support the jury's award of approximately $15 million based on the difference between the value of that with which Kajima parted and the value Kajima actually received. *See Formosa Plastics Corp. USA.,* 960 S.W.2d at 49. Hutchison testified that the "as planned" cost of the job under normal conditions was roughly $17 million, but that the abnormal conditions concealed by Formosa resulted in an additional $18 million being spent to complete the project. Accordingly, Kajima parted with approximately $35 million and actually received only $10 million. The jury's award of approximately $15 million was well under the $25 million difference between the value of that with which Kajima parted and the value Kajima received.

Formosa contends that the trial court erroneously refused to admit evidence of Kajima's "self-inflicted" losses. We have already addressed this argument in connection with Formosa's fifth issue and need not address it further herein.

■ Finally, Formosa alleges that the trial court erroneously refused to instruct the jury on mitigation. The concept of mitigation requires the plaintiff to exercise reasonable care in minimizing its damages. *Great Am. Ins. Co. v. North Austin MUD,* 908 S.W.2d 415, 426 (Tex.1995). The duty to mitigate arises in both con-

tract and tort cases. *See Pulaski Bank & Trust Co. v. Tex. Am. Bank,* 759 S.W.2d 723, 735 (Tex.App.-Dallas 1988, writ denied). The duty to mitigate damages arises only if it can be done with "trifling expense or with reasonable exertions." *Gunn Infiniti v. O'Byrne,* 996 S.W.2d 854, 857 (Tex.1999) (quoting *Walker v. Salt Flat Water Co.,* 128 Tex. 140, 96 S.W.2d 231, 232 (Tex.1936)).

We reject Formosa's contention that the trial court erred in refusing to instruct the jury on mitigation. First, there is authority for the proposition that an injured party is not required to minimize damages resulting from the fraud. *Meadolake Foods, Inc. v. Estes,* 218 S.W.2d 862, 868 (Tex.Civ. App.-El Paso 1948), *writ ref'd n.r.e.,* 148 Tex. 13, 219 S.W.2d 441 (1949); *see Duperier v. Tex. State Bank,* 28 S.W.3d 740, 754 (Tex.App.-Corpus Christi 2000, pet. dism'd by agmt); *New Process Steel Corp., Inc. v. Steel Corp. of Tex., Inc.,* 703 S.W.2d 209, 215 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.).

Second, Formosa had the burden to show that Kajima did not use ordinary care in reducing or avoiding its damages. *See Moulton v. Alamo Ambulance Serv.,* 414 S.W.2d 444, 450 (Tex.1967). To be entitled to a mitigation instruction, the evidence must (1) clearly show that the plaintiff's decision not to mitigate caused further damages, and (2) sufficiently guide the jury in determining which damages were attributable to the plaintiff's decision not to mitigate. *Hygeia Dairy Co. v. Gonzalez,* 994 S.W.2d 220, 225 (Tex.App.-San Antonio 1999, no pet.). The defendant does not have to prove an exact amount of damages attributable to the plaintiff's conduct, but is required to present some evidence from which the jury can make a reasoned calculation of the losses that occurred due to the plaintiff's decision not to mitigate. *Id.*

In the instant case, Formosa has failed to meet its burden to show that Kajima's damages could be mitigated with "trifling expense or with reasonable exertions," that Kajima's decisions caused further damages, or to produce any evidence from which the jury could determine which damages were attributable to Kajima. Because Formosa's proof did not meet these requirements, the court correctly refused the instruction on mitigation. We overrule Formosa's sixth issue.

## VIII. Single Business Enterprise

Prior to trial, the trial court granted Kajima's motion for partial summary judgment and found that Formosa USA and Formosa Texas were operating as a single business enterprise. Accordingly, the jury was instructed that it could consider the conduct of Formosa Texas when deciding the liability of Formosa USA.

In its seventh issue, Formosa contends that the trial court erred by granting a summary judgment finding that Formosa USA and Formosa Texas operated as a single business enterprise. Formosa contends that (1) actual fraud is required for a finding of single business enterprise, (2) single business enterprise is a fact question for the jury, and (3) even if the issue could be considered as a matter of law, Formosa submitted sufficient evidence to create a fact issue.

For the purposes of legal proceedings, subsidiary corporations and parent corporations are separate and distinct "persons" as a matter of law, and the separate entity of corporations will generally be observed by the courts even where one company may dominate or control the other company, or treats the other company as a mere department, instrumentality, or agency. *Valero S. Tex. Processing Co. v. Starr County Appraisal Dist.,* 954

S.W.2d 863, 866 (Tex.App.-San Antonio 1997, pet. denied). The "single business enterprise" theory is an equitable doctrine used to disregard the separate existence of corporations when the corporations are not operated as separate entities, but rather integrate their resources to achieve a common business purpose. *Old Republic Ins. Co. v. Ex–Im Servs. Corp.*, 920 S.W.2d 393, 395–96 (Tex.App.-Houston [1st Dist.] 1996, no writ).

Several intermediate appellate courts, including this Court, have recognized a concept of "single business enterprise" in one context or another. *See, e.g., Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 150 S.W.3d 718, 744 (Tex.App.-Austin 2004, pet. filed) (recognizing doctrine as a valid equitable means of piercing the corporate veil to impose liability); *Bridgestone Corp. v. Lopez*, 131 S.W.3d 670, 686–87 (Tex. App.-Corpus Christi 2004, pet. granted, judgm't vacated w.r.m.) (finding exercise of jurisdiction comported with due process where two corporations operated as a single business enterprise); *El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero, S.A. de C.V.*, 82 S.W.3d 622, 636–37 (Tex.App.-Corpus Christi 2002, pet. dism'd w.o.j.) (affirming denial of special appearance where companies shared common employees, used a centralized accounting system, and performed services for each other); *In re U–Haul Int'l*, 87 S.W.3d 653, 657 (Tex.App.-San Antonio 2002, no pet.) (considering the issue of document production from entities alleged to operate as a single business enterprise); *N. Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 119–21 (Tex.App.-Beaumont 2001, pet. denied) (recognizing equitable doctrine may apply under exceptional circumstances); *Aluminum Chems. (Bolivia), Inc. v. Bechtel Corp.*, 28 S.W.3d 64, 68 (Tex.App.-Texarkana 2000, no pet.) (concluding that appellant had waived issue pertaining to single business enterprise);

*Hall v. Timmons*, 987 S.W.2d 248, 255–56 (Tex.App.-Beaumont 1999, no pet.) (concluding that more than a scintilla of evidence supported the jury's finding of a single business enterprise); *Paramount Petroleum Corp. v. Taylor Rental Ctr.*, 712 S.W.2d 534, 536 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.) (same); *see SSP Partners v. Gladstrong Invs. (USA) Corp.*, 169 S.W.3d 27, 44 (Tex.App.-Corpus Christi 2005, pet. filed) (declining to extend the doctrine to a party's vicarious liability for the wrongful acts of a non-party); *see also Allright Tex., Inc. v. Simons*, 501 S.W.2d 145, 150 (Tex.Civ.App.-Houston [1st Dist.] 1973, writ ref'd n.r.e.); *Murphy Bros. Chevrolet v. E. Oakland Auto Auction*, 437 S.W.2d 272, 275–76 (Tex.Civ. App.-El Paso 1969, writ ref'd n.r.e.). We would note that the supreme court has not spoken on the viability of the single business enterprise theory. *See Southern Union Co. v. City of Edinburg*, 129 S.W.3d 74, 87 (Tex.2003) ("We need not decide today whether a theory of 'single business enterprise' is a necessary addition to Texas law regarding the theory of alter ego for disregarding corporate structure and the theories of joint venture, joint enterprise, or partnership for imposing joint and several liability.").

Factors to be considered in determining whether separate corporations should be treated as one enterprise include: (1) common employees; (2) common offices; (3) centralized accounting; (4) payment of wages by one corporation to another corporation's employees; (5) common business name; (6) services rendered by the employees of one corporation on behalf of another corporation; (7) undocumented transfers of funds between corporations; and (8) unclear allocation of profits and losses between corporations. *Paramount Petroleum Corp.*, 712 S.W.2d at 536.

■ The purpose of the single business enterprise theory, like the alter ego theory and other doctrines designed to pierce the corporate veil, is to prevent an inequitable result. *See Castleberry v. Branscum,* 721 S.W.2d 270, 271 (Tex.1986).[6] The courts have articulated several different rationales for disregarding the corporate fiction, including: (1) when it is used as a means of perpetrating fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where it is used to evade an existing legal obligation; (4) where it is employed to achieve or perpetrate a monopoly; (5) where it is used to circumvent a statute; and (6) where the corporate fiction is relied upon as a protection of crime or to justify wrong. *Id.* at 272.

■ We first address Formosa's assertion that actual fraud is required for a finding of single business enterprise. Formosa bases its argument on article 2.21(A)(2) of the Texas Business Corporation Act. *See* TEX. BUS. CORP. ACT ANN. art. 2.21(A)(2) (Vernon 2003).[7] This section provides:

A. A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate thereof or of the corporation, shall be under no obligation to the corporation or to its obligees with respect to:

...

(2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the

basis that the holder, owner, subscriber, or affiliate is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory, unless the obligee demonstrates that the holder, owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, subscriber, or affiliate ...

TEX. BUS. CORP. ANN. art. 2.21(A) (Vernon 2003). The 1996 Bar Committee Comment to article 2.21 of the Texas Business Corporation Act states:

*Castleberry,* in particular its use of constructive fraud as a basis of piercing the corporate veil, was considered by many practitioners to be incorrectly decided. Further, while questionable in the context of tort claims, the use of constructive fraud as a means of piercing the corporate veil created a cloud on the sanctity of contract and the public policy of recognizing corporations as separate entities apart from their shareholders. In response to *Castleberry,* Article 2.21 of the TBCA was amended in 1989 to establish a clear legislative standard under which the liability of a shareholder for the obligations of a corporation is to be determined in the context of contractual obligations and all matters relating thereto.

---

**6.** *Castleberry* is cited herein for its historical discussion of the origins of these theories, but it has been largely superceded by subsequent statutory amendments. *Compare Castleberry v. Branscum,* 721 S.W.2d 270 (Tex.1986); *with* TEX. BUS. ORGS.CODE § 21.223 (Vernon Supp.2006) (effective January 1, 2006).

**7.** The elements necessary to impose personal liability on a shareholder have been carried forward in section 21.223 of the Business Organizations Code. *See* TEX. BUS. ORG.CODE ANN. § 21.223 (Vernon Supp.2006). That code became effective January 1, 2006, however, the Business Corporation Act continues in effect until January 1, 2010 for corporations formed before January 1, 2006.

*Id.* art. 2.21 cmt. (Vernon 2003); *see Willis v. Donnelly,* 199 S.W.3d 262, 272 (Tex. 2006). Under the current statute, a shareholder "may not be held liable to the corporation or its obligees with respect to ... any contractual obligation of the corporation ... on the basis that the holder ... is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory ... unless the shareholder caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the shareholder...." *Id.* art. 2.21(A); *see Willis,* 199 S.W.3d at 272.[8] The statute is the "exclusive" means for imposing liability on a corporation for the obligations of another corporation in which it holds shares. *S. Union Co.,* 129 S.W.3d at 87; *see Willis,* 199 S.W.3d at 272 (providing that the liability of a shareholder for a contractual corporate debt under this statute "is exclusive and preempts any other liability imposed for that obligation under common law or otherwise") (citing current § 21.224). The references to "alter ego" and "other similar theory" in the current statute were added in 1993 amendments to the Business Corporation Act. *Willis,* 199 S.W.3d at 272; *see* Act of May 7, 1993, 73d

Leg., R.S., ch. 215, § 2.05(A)(2), 1993 Tex. Gen. Laws 418, 446. There are statutory exceptions to this general rule, as for example, where the shareholder expressly agrees to be personally liable to the obligee for the obligation. TEX. BUS. CORP. ACT. ANN. art. 2.21(B)(1) (Vernon 2003); *see now* TEX. BUS. ORGS.CODE ANN. § 21.225(1).

Article 2.21 applies to contractual obligations "or any matter relating to or arising from the obligation." Although this matter was submitted to the jury on the issue of fraud, the fraud at issue arises from the contracts between the parties. Accordingly, we assume, without deciding, that this is a matter relating to or arising from the contracts. Thus, we further assume that article 2.21 applies to the instant case.

Utilizing the language of article 2.21, if this case involved a contract signed by Formosa Texas, then Formosa USA would be under no obligation to Formosa Texas or Kajima with respect to any contractual obligation of Formosa Texas, or any matter relating to or arising from that obligation, on the basis that Formosa USA is a single business enterprise with Formosa Texas, unless Kajima demonstrated that Formosa USA caused Formosa Texas to

---

8. We note that case law is divided regarding whether actual fraud is required for vicarious liability under the statute. Some cases, including cases decided by this Court, have held that no proof of fraud is required to recover under a single business enterprise theory because the single business enterprise theory relies on equity, similar to partnership principles of liability. *See, e.g., PHC–Minden, L.P. v. Kimberly–Clark Corp.,* 202 S.W.3d 193 (Tex. App.-Tyler 2005, pet. granted); *Bridgestone Corp. v. Lopez,* 131 S.W.3d 670, 682 (Tex. App.-Corpus Christi 2004, pet. granted, judgment vacated w.r.m.); *N. Am. Van Lines, Inc. v. Emmons,* 50 S.W.3d 103, 119 (Tex.App.-Beaumont 2001, pet. denied) (citing *Aluminum Chems. (Bolivia), Inc. v. Bechtel Corp.,* 28 S.W.3d 64, 68 (Tex.App.-Texarkana 2000, no

pet.)). Other courts have refused to apply the statute to tort cases and have limited its application to contract cases. *See, e.g., Love v. State,* 972 S.W.2d 114, 118 (Tex.App.-Austin 1998, pet. denied) ("The Act itself makes clear that actual fraud is required only in the context of contractual obligations."). Other cases require actual fraud in any context. *See, e.g., Menetti v. Chavers,* 974 S.W.2d 168, 174 (Tex.App.-San Antonio 1998, no pet.) ("A finding that no actual fraud was committed destroys not only the attempt to pierce the corporate veil by a showing of an alter ego, but by 'other similar theories.' "). Because our disposition of Formosa's argument does not rely on any of these approaches, we need not and will not attempt to reconcile these cases herein.

be used for the purpose of perpetrating and did perpetrate an actual fraud on Kajima, primarily for the direct personal benefit of Formosa USA.

However, that is not the case now before the Court.

Based on the facts before this Court, we conclude that article 2.21 does not apply in the instant case because the contracts were signed by Formosa USA, not Formosa Texas, its wholly owned subsidiary. There is no Formosa Texas contract. Formosa Texas is not a party to the contracts at issue in this case.

Moreover, in the instant case, the jury found Formosa USA guilty of its own fraud. As discussed herein, evidence supports the jury's finding that Formosa USA committed fraud. Because the evidence of Formosa USA's own fraud is sufficient to support the jury's finding that Formosa USA committed fraud, Formosa has not been harmed by the trial court's ruling on the single business enterprise.

 In its next two subissues, Formosa contends that whether a single business enterprise exists is a fact question for the jury, and even if the issue could be considered as a matter of law, Formosa submitted sufficient evidence to create a fact issue. As an initial matter, we note that appellate courts have considered single business enterprise to be a matter of law. *See Allright Tex., Inc. v. Simons,* 501 S.W.2d 145, 150 (Tex.Civ.App.-Houston [1st Dist.] 1973, writ ref'd n.r.e.); *see also Murphy Bros. Chevrolet Co. v. E. Oakland Auto Auction,* 437 S.W.2d 272, 276 (Tex. Civ.App.-El Paso 1969, writ ref'd n.r.e.). However, whether or not single business enterprise is a fact issue for the jury or an issue that can be established as a matter of law, we conclude that Kajima offered sufficient evidence for the trial court to grant a partial summary judgment resolving that Formosa USA and Formosa Texas should be treated as one enterprise.

The companies had common employees during the relevant period of time, such as Susan Wang, executive vice president for both companies. The companies shared common offices at 9 Peach Tree Hill Road, Livingston, New Jersey 07039. With regard to the project at issue, the companies had a centralized or coordinated accounting system to the extent they related to approval of construction change orders with regard to the project. Both companies shared a common business name: "Formosa." Employees of one corporation rendered services on behalf of the other. Glenn Dobbs, an employee of Formosa Texas, performed bid analyses for Formosa USA on the construction project. Robert Hsueh and Simon Chang, both employees of Formosa Texas, reported to L.F. Pan, who was employed by Formosa USA. The director of legal services for Formosa Texas, Camp Mehrens, reported to Jack Wu, an officer of both Formosa Texas and Formosa USA. Another employee, Jack Huang, testified he was not sure if he worked for Formosa USA or Formosa Texas on the Point Comfort project. Another employee, Jeff Tseng, testified he did not understand the differences between Formosa USA and Formosa Texas.

Considering these facts and comparing them to the factors enunciated in *Paramount Petroleum Corp. v. Taylor Rental Ctr.,* for determining whether separate corporations should be treated as one enterprise, we conclude that Kajima met its burden of showing both no genuine issue of material fact and entitlement to partial judgment as a matter of law on the issue of single business enterprise. *See* TEX.R. CIV. P. 166a(c); *Paramount Petroleum Corp.,* 712 S.W.2d at 536. We overrule Formosa's seventh issue.

## IX. Withholding Evidence

In its eighth issue, Formosa alleges that the trial court erred by withholding documentary evidence from the jury during its deliberations even though the documents had been admitted into evidence. Formosa's complaint concerns twenty-seven volumes of CTCI drawings, engineering design drawings used to bid and build the CM 903 project. Formosa contends that these drawings were the center of Kajima's fraud claim insofar as Kajima asserted that the drawings were defective, Formosa knew they were defective, and Formosa withheld that information from Kajima. In contrast, Formosa contended that the expert testimony indicated the CTCI drawings were suitable to bid and build the project. Accordingly, Formosa contends that the documents were crucial for the jury to review. Kajima argues that the drawings, other than those included in the CM 903 bid package, were not in evidence. The trial court allowed the jury to have only the drawings that were part of the CM 903 bid package.

Texas Rule of Civil Procedure 281 provides that:

> The jury may, and on request shall, take with them in their retirement the charges and instructions, general or special, which were given and read to them, and any written evidence, except the depositions of witnesses, but shall not take with them any special charges which have been refused. Where part only of a paper has been read in evidence, the jury shall not take the same with them, unless the part so read to them is detached from that which was excluded.

This rule is mandatory, and the trial court is required to send all exhibits admitted into evidence to the jury room during deliberations. *First Employees Ins. Co. v. Skinner*, 646 S.W.2d 170, 172 (Tex.1983).

However, any error in failing to send exhibits to the jury room during deliberations does not call for reversal unless the error probably caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1(a)(1).

In this case, the reporter's record does not indicate that all of the drawings were admitted into evidence. In fact, earlier in the trial, the trial court did not allow some of the drawings to be published to the jury on grounds that they were not part of the contract. Accordingly, the trial court did not err. Even if the trial court erred; however, we cannot conclude that any alleged error probably caused the rendition of an improper judgment. We overrule Formosa's eighth issue.

## X. Prejudgment Interest

In its ninth and final issue, Formosa contends that the trial court erred by awarding Kajima excessive prejudgment interest. Specifically, Formosa contends that, under *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex.1998), the trial court should have applied section 304.105 of the Texas Finance Code to reduce Kajima's claim for prejudgment interest. *See* Tex. Fin.Code Ann. § 304.105 (Vernon 2006). Section 304.105(b) provides, in part, that:

> If judgment for a claimant is more than the amount of a settlement offer of the defendant, prejudgment interest does not accrue on the amount of the settlement offer during the period the offer may be accepted.

*Id.* § 304.105(b). Formosa contends that it made several settlement offers to Kajima, including an offer of $15,361,000, and the trial court should not have awarded prejudgment interest for the relevant periods of time during which the offers could have been accepted.

There are two legal sources for an award of prejudgment interest: (1) common law equitable principles; and (2) an enabling statute. *Johnson & Higgins of Tex., Inc.,* 962 S.W.2d at 528 (Tex.1998). In *Johnson & Higgins,* the Texas Supreme Court recognized that the statutory prejudgment interest scheme conflicted in several respects with the common law regarding prejudgment interest. *Id.* at 528–31. Accordingly, the court harmonized certain aspects of the common law prejudgment interest accrual scheme to accord with that found in the finance code. *Id.; City of Houston v. Texan Land & Cattle Co.,* 138 S.W.3d 382, 388 (Tex.App.-Houston [14th Dist.] 2004, no pet.). Specifically, the Texas Supreme Court (1) changed the common law accrual date for prejudgment interest to match that ordered by statute, (2) ordered that prejudgment interest be computed as simple interest, as in the statute, rather than as compound interest, and (3) made the prejudgment interest rate the same as the postjudgment interest rate, again, as in the statute. *Johnson & Higgins of Tex., Inc.,* 962 S.W.2d at 531–32.

Formosa contends that *Johnson & Higgins* mandates the application of section 304.105(b) to this case. The express language of the finance code indicates otherwise. Chapter 304 of the finance code governs judgment interest. *See generally* Tex. Fin.Code Ann. §§ 304.001–.302 (Vernon 2006). Section 304.101 of the code provides that subchapter B, which governs prejudgment interest, "applies only to a wrongful death, personal injury, or proper-ty damage case of a court of this state." *Id.* § 304.101. Section 304.105, addressing the effect of a settlement offer on the accrual of prejudgment interest, is part of subchapter B, and accordingly, applies only to wrongful death, personal injury, or property damage cases. *Id.* § 304.105. The instant case is not a case for wrongful death, personal injury, or property damage; accordingly, section 304.105 does not apply. *See id.*

Contrary to Formosa's argument, nothing in *Johnson & Higgins* can be read to require the application of section 304.105(b) to this case. In fact, in *Johnson & Higgins,* the supreme court itself rejected the wholesale application of the finance code to all common law cases. "We hold that section 6 means what it says: statutory prejudgment interest applies only to wrongful death, personal injury, and property damage cases." *See Johnson & Higgins of Tex., Inc.,* 962 S.W.2d at 530. Moreover, this argument has previously been rejected by the Texarkana Court of Appeals. *Head Indus. Coatings & Servs., Inc. v. Maryland Ins. Co.,* 981 S.W.2d 305, 311 (Tex.App.-Texarkana 1998, pet. denied); *see de la Garza v. de la Garza,* 185 S.W.3d 924, 928 (Tex. App.-Dallas 2006, no pet.) (stating that prejudgment interest under the finance code applies only to wrongful death, personal injury, and property damage cases).[9] Accordingly, we overrule Formosa's ninth and final issue.

## XI. Conclusion

We conclude that Formosa failed to meet its burden of proof to disqualify

---

9. Although not cited by Formosa in its brief, we note that dicta in *Shoreline, Inc. v. Hisel,* 115 S.W.3d 21 (Tex.App.-Corpus Christi 2003, pet. denied), discusses the application of certain sections of chapter 304 of the finance code to an employment discrimination case. *See id.* at 24–25. *Shoreline* is distinguishable from the instant case insofar as it concerns the finality of a judgment that failed to specify the amount of prejudgment interest due on a judgment. *See id.* To the extent that the dicta therein could be construed to indicate that sections of the finance code are applicable to causes of action other than wrongful death, personal injury, or property damage, we would hereby disapprove it.

Hutchison, and, accordingly, we overrule Formosa's third issue. We also overrule the remainder of Formosa's issues on appeal. We affirm the judgment of the trial court.

Concurring opinion by Justice CASTILLO.

Dissenting opinion by Justice YAÑEZ, joined by Justice HINOJOSA.

CASTILLO, Justice, concurring.

The majority concludes that the trial court abused its discretion in refusing to disqualify Hutchison as an expert witness for Kajima. For the same reasons espoused on original submission, I respectfully concur with the result.

## I. HISTORY OF THE CASE

This is a suit for fraud tried to a jury after appeal and remand. In January 1993, Kajima International, Inc. ("Kajima"), an international industrial construction firm, sued Formosa Plastics Corporation, USA and Formosa Plastics Corporation, Texas ("Formosa"), a petrochemical company with operations in Point Comfort, Calhoun County, Texas. Kajima sought damages for fraud, breach of contract, quantum meruit, and negligent misrepresentation arising out of five contracts for work performed by Kajima in expanding Formosa's Point Comfort facility.[1]

After two mistrials, the case went to jury verdict in 1997. The trial court entered judgment notwithstanding the jury's findings in Kajima's favor on some but not all of Kajima's theories of recovery. Kajima appealed the resulting judgment for $5,591,066.65, complaining that the trial court erroneously refused to submit a broad-form fraud question. This Court held that the trial court abused its discretion in submitting a fraud question that precluded the jury's consideration of "string-along" fraud that occurred after execution of the written contracts. *Kajima Int'l, Inc. v. Formosa Plastics Corp.*, 15 S.W.3d 289, 294 (Tex.App.-Corpus Christi 2000, pet. denied) ("*Kajima I*"). We reversed and remanded for a new trial. *Id.* at 294.

After remand, Kajima moved for a partial summary judgment that Formosa USA and Formosa Texas comprised a single business enterprise. The trial court agreed. Kajima nonsuited Formosa Texas. It also nonsuited all of its claims against Formosa USA except fraud.

Before and during both the retrial in 2002 and the 1997 trial, Formosa unsuccessfully sought to strike Kajima's expert witness, claiming that the witness's opinions were unreliable and that he had "switched sides" during the litigation. At the 2002 trial, the expert testified, over Formosa's objection, that Kajima expended $38,717,854.00 in total costs in completing the project. He also testified Kajima expended $3,330,547.00 in costs that added no value to the project. The parties did not dispute that Formosa paid Kajima approximately $10,000,000.00 on the project. Kajima's expert concluded that Kajima's out-of-pocket damages equaled $25,387,380.00.

At the conclusion of the evidence, the trial court submitted a single broad-form fraud question to the jury. It refused Formosa's request for a fraud question that asked for separate findings as to each contract. It also refused Formosa's re-

---

1. For a more detailed discussion of the relevant facts, see this Court's opinion in *Kajima Int'l v. Formosa Plastics Corp.*, 15 S.W.3d 289, 291 (Tex.App.-Corpus Christi 2000, pet. denied).

quested mitigation instruction and ratification question.

Before the 1997 trial, the parties had entered into a rule 11 agreement regarding the admissibility of thousands of pages of documents. *See* Tex.R. Civ. P. 11. After remand, the parties agreed that their rule 11 agreement regarding the admissibility of each party's trial exhibits applied to the second trial. During deliberations at the second trial, the jury requested all trial exhibits. Kajima objected to providing post-contract technical drawings to the jury on the grounds that they were irrelevant, misleading, and not in evidence. Formosa responded that the documents were admitted in accordance with the parties' rule 11 agreement. The trial court sustained Kajima's objections as to all post-contract drawings.

After deliberating, the jury answered the broad-form fraud question in Kajima's favor. It assessed Kajima's damages at $15,432,123.45. The resulting judgment against Formosa, filed April 12, 2002, awarded Kajima $15,432,123.45 in actual fraud damages, $403,156.86 in costs, and $14,210,269.65 in prejudgment interest at the rate of ten percent per annum, for a total judgment of $29,642,393.10. The judgment also awarded postjudgment interest at the rate of ten percent. In postjudgment motions, Formosa sought an adjustment of the prejudgment interest awarded in the judgment to reflect settlement credits. The trial court refused.

This appeal ensued. Formosa presents nine issues. The majority sustains the third issue, reverses and remands. For the reasons stated below, I would affirm the judgment.

## II. DISPOSITION

### A. The Evidentiary Issues

In the second part of issue three, Formosa asserts that the trial court abused its discretion in denying its challenge to Kajima's expert, arguing that the expert's methodology was unreliable. In the first part of issue three, Formosa also claims that the trial court should have struck the expert because of a disqualifying "side-switching" conflict of interest. In issue five, Formosa challenges the trial court's exclusion of evidence that Kajima caused a portion of its own damages by underbidding the contracts and other "self-inflicted" losses.

### 1. The Expert Witness Challenges

#### a. Reliability

Formosa asserts that the opinions of Kajima's expert witness, A.W. "Chip" Hutchison, are unreliable. Relying on *Robinson* and its progeny, Formosa contends that Hutchison's method of formulating his opinions, to which the expert referred as the "Hutchison Method," is idiosyncratic and not accepted within the construction industry. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 554 (Tex.1995). Kajima acknowledges that the expert used the term "Hutchison Method" in promotional materials to describe his methodology. However, Kajima argues, Hutchison did not testify in the 2002 trial about delay causation, which is the area of expertise to which Formosa directs its argument, but only about the value of the work Kajima performed for Formosa. Kajima notes that Formosa fully cross-examined Hutchison and challenged his damages calculations. In any event, Kajima contends, Formosa did not challenge Hutchison's qualifications, based on his education and extensive experience in the construction industry, to render an opinion about the value of the work performed by Kajima. By not raising the issue in the trial court, Kajima concludes, Formosa waived its

challenge on appeal to the reliability of Hutchison's opinions regarding Kajima's damages. I note that on appeal, Formosa does not challenge Hutchison's credentials or expertise or otherwise assert that Hutchison was unqualified or that his opinions were not relevant. Rather, Formosa asserts that Hutchison's opinions were not based on a reliable foundation.

### (1) Standard of Review and Burden of Proof

Rule 702 of the Texas Rules of Evidence governs the admissibility of expert testimony. *See* Tex.R. Evid. 702; *Robinson,* 923 S.W.2d at 554. Rule 702 provides: "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex.R. Evid. 702; *Tamez v. Mack Trucks, Inc.,* 100 S.W.3d 549, 554 (Tex.App.-Corpus Christi 2003, pet. granted). The expert must be qualified to render the proffered opinions. *Id.* at 556. The testimony also must be relevant and based on a reliable foundation. *Id.* Once the opposing party objects to proffered expert testimony, the proponent of the witness's testimony bears the burden of demonstrating its admissibility. *Id.* at 557.

To meet this burden, the proponent must demonstrate that: (1) the expert is qualified; and (2) the expert's testimony is relevant and reliable. *See Robinson,* 923 S.W.2d at 556. These are threshold issues the trial court determines under rule 104(a) before admitting the testimony. *See* Tex.R. Evid. 104(a); *Robinson,* 923 S.W.2d at 556. In this regard, the trial

court acts as a "gatekeeper." *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex.1998). We review a trial court's preliminary determination of the admissibility of expert witness testimony under an abuse-of-discretion standard. *Guadalupe–Blanco River Auth. v. Kraft,* 77 S.W.3d 805, 807 (Tex.2002); *Tamez,* 100 S.W.3d at 554.

### (2) Reliability Scope of Review

I note that Formosa objected to the reliability of Hutchison's opinions before, during, and after both the 1997 and the 2002 trials. The record before us consists of Hutchison's 1997 affidavit as well as testimony in multiple proceedings, including both trials.[2] The trial court took judicial notice of the prior proceedings, including a *Robinson* hearing, during the 2002 trial. This Court has not had occasion to determine the scope of our review in examining a trial court's exercise of discretion in performing its gatekeeping function with regard to expert testimony. Two of our sister courts of appeals have concluded that an appellate court examines the record as a whole when reviewing the trial court's preliminary admissibility determinations under rule 104(a). *In re J.B.,* 93 S.W.3d 609, 619–20 (Tex.App.-Waco 2002, pet. denied); *accord State Farm Fire & Cas. Co. v. Rodriguez,* 88 S.W.3d 313, 320 (Tex.App.-San Antonio 2002, pet. denied) ("The record as a whole shows that [the expert's] opinions are grounded in scientific method and procedure and amount to more than subjective belief or unsupported speculation."). On this record, in light of the multiple proceedings in which Hutchison's testimony was both offered and cross-examined, I would hold that the scope of our review of the reliability of his

---

**2.** We ordered the record of the 1997 trial included within the record of this appeal along with the record of the 2002 trial.

opinions encompasses the complete record. *See In re J.B.*, 93 S.W.3d at 619–20; *see also State Farm Fire & Cas. Co.*, 88 S.W.3d at 320.

### (3) Reliability Analysis

In his affidavit, Hutchison stated: "In the Kajima/Formosa litigation, my firm has spent the past three years analyzing approximately one million pages of project-related records." He explained his methodology:

> The methodology that is generally accepted as the most appropriate approach to use to evaluate an industrial project is called the "as-released" method. This methodology has been subject to peer review and scrutiny for many years. For the past 17 years, my area of specialization has been the analysis of industrial construction jobs and the quantification of damages that involve delays, acceleration, disruption and productivity losses. The "as-released" approach is widely used for both litigation and non-litigation construction management purposes. Courts have reviewed the methodology applied in this case, and have found that it was both logical and reasonably calculated to reflect the extent of delays and causation for such delays.... The general approach that I used in analyzing the delay, related acceleration and extra work on all five jobs at issue in this is the "as-released" method.... The approach which we have used to evaluate this case has been used countless times in analyzing industrial projects. It has been used outside the litigation context on a number of occasions, including (1) University of North Carolina Cogeneration Facility in Chapel Hill, (2) Vetrotex Certainteed plant in Wichita Falls, Texas, (3) Westinghouse Saraville facility in Saraville, New Jersey, (4) Dallas Civil Center, and (5) Fort Worth Sewage Treatment facili-

> ty. The approach I described above is utilized in management of projects as well as analysis of claims after the projects have been completed. This approach is the only effective method used in analyzing complex industrial projects by engineers and consultants who specialize in that endeavor.

At one *Robinson* hearing, Hutchison testified the "as-released" method "is something that's about, I would say, 20 years old, 17 years old. It has been around a long time and is new in relation to construction but not new in terms of its use in forecasting and in evaluating project delay and work restriction." After developing Hutchison's qualifications through education and extensive experience in the construction industry (which Formosa has not challenged), Kajima established Hutchison's expertise with regard to evaluating construction delays:

Q. Okay. Now, your company does construction management and analysis of delays and what causes delays on large industrial projects?

A. Yes, sir.

Q. Okay. As part of what you do, do you determine why delays occur?

A. Yes, sir.

Q. That's what people hire you to do?

A. It is.

Q. And are you hired usually to determine who or what causes the delays?

A. I am.

Q. Do you determine how much those delays cost?

A. I do, yes, sir.

Q. And what is the process of determining how much the delays cost? What's the method that you go through to determine that?

A. Quantification of damages, which is what I call what it costs, which is to

go into the project records and to look at how the money was expended and to study the crude composition of the job and to see how crews were used and to see what conditions this labor was subjected is part and parcel of evaluating why projects cost more than they are planned to cost.

The first step in any analysis is to find out what is the estimate, what should it cost, what is the—what is the normal cost to accomplish this work.

The next is to identify what are the additional tasks. In some cases, it is a very easy, discrete exercise of simply looking at extra work, such as the double jointing of pipe on this project. In other cases, it has to do with phenomenon associated with overcrowding or overtime or congestion or dilution of supervision, all concepts which have been around in construction for years and years and years and have been evaluated by our firm for the past 17 years but have been evaluated by many different experts and authorities over that time.

Q. How many years have you personally spent analyzing causes of delays and quantification of the cost of those delays on large industrial projects like the Formosa job?

A. For the past 17 years.

Q. That's what you do for a living?

A. That's what I do for a living.

However, at the 2002 trial, as Kajima points out, the basis for Hutchison's opinions consisted of Formosa's documents, including internal memoranda, not the expert's "as-released" methodology. Hutchison testified:

Q. Mr. Hutchison, to keep in perspective what's at issue in this case, one of the questions that the jury's going to

be asked . . . is did Formosa commit fraud against Kajima?

A. Yes, sir.

Q. Now, one of the things that we're going to want to be looking at and I think it's agreed that it's important is what did Formosa know before Kajima signed its contracts. And have you seen any evidence in this record that Formosa knew that these drawing problems existed and that Kajima would have the very types of problems that it had on this job and that they knew that before Kajima signed its contract?

A. Yes, sir, I have. And that's really the unbelievable part of this, is that Formosa knew it and they still let this job go forward.

Q. Now, do you base that on the Formosa internal memos that you've seen that were written before Kajima signed its contract?

A. Yes, sir.

Hutchison's 2002 trial testimony shows that Hutchison did not testify to any opinion regarding application of the "as-released" methodology in determining causation for the construction delays alleged by Kajima to have been caused by Formosa. In arguments to the trial court, Formosa acknowledged that Hutchison did not discuss "the 'as built' or the Hutchison Method that he made so much of at the last trial having anything to do with fraud damages." Rather, Hutchison arrived at his opinions by applying his knowledge, skill, experience, training, and education to his review of relevant construction documents. He then testified to a summary of his review of the documents as the basis for his opinions. *See* TEX.R. EVID. 1006. I conclude that Hutchison's opinions regarding Formosa's culpability for fraud and the value of Kajima's work on the project were based on his education and extensive expe-

rience in the construction industry, not on the "as-released" methodology challenged by Formosa in this appeal. Accordingly, I do not find any "analytical gap" between Hutchison's testimony and the basis for his opinions, nor do I find his opinions to be "subjective belief or unsupported speculation." *See Gammill,* 972 S.W.2d at 726. I would hold that the trial court did not abuse its discretion in determining that Hutchison's testimony met the threshold reliability requirements of rule 702. *See* Tex.R. Evid. 702. I would overrule the second part of Formosa's third issue.

### b. Conflict of Interest

#### (1) The "Side–Switching" Issue

Formosa's attempt to disqualify Kajima's expert witness because of "side-switching" presents an issue of first impression in Texas. The parties agree that Kajima retained Hutchison as an expert witness. Hutchison was associated with Steve Huyghe, an expert witness initially consulted by Formosa. Formosa asserts that: (1) it disclosed confidential information to Huyghe; (2) Huyghe actually disclosed those confidences to Hutchison; or (3) Huyghe is presumed conclusively to have disclosed Formosa's confidences to Hutchison because of their association.

Kajima responds that: (1) Kajima did not retain Huyghe, who was an employee of a corporation that is a separate entity from the corporation that employed Hutchison, and Formosa did not retain Hutchison; (2) Formosa did not disclose any confidential information to Huyghe; (3) even if Formosa did disclose confidential information to Huyghe, knowledge of that information cannot be imputed to Kajima's testifying expert merely because Huyghe was employed by a corporation controlled by Hutchison; (4) even if Formosa disclosed confidential information to Huyghe, the information was subject to

discovery because Formosa's own testifying expert witness reviewed Huyghe's work product; and (5) Formosa did not formally retain Huyghe and did not sign a retention agreement provided by Huyghe that included a confidentiality and non-disclosure clause, thus waiving any claim now that the information it provided to Huyghe was confidential.

Formosa counters that: (1) Hutchison controlled both A.W. Hutchison & Associates of California, Inc. ("AWH–C"), which was the California corporation that employed Huyghe, and A.W. Hutchison & Associates, Inc. ("AWH"), which was the Georgia corporation that employed Hutchison; and (2) the two corporations merged prior to trial. I turn first to determining the standard and scope of review applicable to this analysis.

#### (2) Expert Disqualification Standard and Scope of Review

No Texas court has set out the legal standards by which we must analyze Formosa's motion to strike Kajima's expert for a disqualifying conflict of interest. As noted above, the abuse-of-discretion standard applies to appellate review of the trial court's preliminary determinations of expert qualifications and the relevance and reliability of the expert's testimony. *Kraft,* 77 S.W.3d at 807; *Tamez,* 100 S.W.3d at 554. I also note that we apply an abuse-of-discretion standard in reviewing attorney disqualification motions. *Metro. Life Ins. Co. v. Syntek Fin. Corp.,* 881 S.W.2d 319, 321 (Tex.1994). Specifically, this Court has reviewed under an abuse-of-discretion standard an attorney disqualification motion that alleged the sharing of confidential information between counsel for co-defendants. *See Rio Hondo Implement Co. v. Euresti,* 903 S.W.2d 128, 132 (Tex.App.-Corpus Christi 1995, orig. proceeding) ("We review the

trial court's finding that confidential information was or was not shared under an abuse of discretion standard."). Thus, only for purposes of determining the standard of review to apply to Formosa's conflict-of-interest challenge to Kajima's expert, I analogize to the standards associated with appellate review of a trial court's ruling on an attorney disqualification motion. Accordingly, I would hold that an abuse-of-discretion standard applies to our review of the trial court's denial of Formosa's motion to strike Kajima's expert because of a disqualifying conflict of interest. *See Kraft*, 77 S.W.3d at 807; *see also Rio Hondo Implement Co.*, 903 S.W.2d at 132.

Further, I already have determined, given the procedural posture of this case, that the scope of appellate review of Formosa's challenge to the reliability of Kajima's expert's opinions encompasses the record as a whole. I have found no authority restricting the scope of review of Formosa's conflicted-expert issue. Accordingly, I would also hold that Formosa's motion to strike Kajima's expert because of a disqualifying conflict of interest encompasses the record as a whole, including documents submitted to the trial court *in camera*.

### (3) The "Side–Switching" Facts

In June of 1993, Huyghe called on Formosa and offered the services of AWH–C to assist in Formosa's litigation with Kajima. Huyghe met with Formosa's in-house counsel. Huyghe also met with Formosa's outside counsel. He confirmed the meeting in a letter dated June 14, 1993 in which he referenced prior work AWH–C had performed for Kajima:

As we briefly discussed, we have a working knowledge of Kajima and the Japa-

nese way of doing business as a result of our involvement in their Fuji Photo Film Processing Plant project, among others for Japanese clients over the past five years, and this could be advantageous should negotiations occur.

From June through December of 1993, Huyghe and other AWH–C employees met with Formosa's outside counsel and reviewed, organized, and indexed more than sixty boxes of documents produced by Kajima to Formosa in discovery. Formosa did not seek any confidentiality or nondisclosure agreement with AWH–C before outside counsel met with AWH–C staff or before they transmitted documents to Huyghe. The lawyer who was the primary contact for Huyghe testified:

[I]t wasn't so urgent for us to enter into a confidentiality agreement with him. We've used him as an expert before. We certainly don't feel like that he is green as far as knowing what goes on in these kinds of situations. And, therefore, it just isn't—it wasn't necessary for us to enter into a confidentiality agreement with him before we disclosed confidential information.

The law firm did not ask Huyghe to agree to maintain Formosa's confidentiality. Huyghe submitted bills totaling $22,350.11, including $8,493.50 for a proposed task list, $7,549.50 for clerical indexing, and $6,307.11 in reimbursable expenses.[3] Invoices detailing the work show a total of 13.5 hours for "discussion with client/counsel" out of a total of 167.5 billed hours. On October 19, 1993, Huyghe submitted a retention agreement for completion of the proposed task list to Formosa's outside counsel. The retention agreement

---

**3.** The letterhead on the invoices shows "A.W. Hutchison & Associates, Inc." at an Atlanta, Georgia address. Payment documentation in the record includes a check from Formosa made payable to "A.W. Hutchison, Inc." for $20,875.89.

included a confidentiality and non-disclosure clause:

All such services and the resultant work product shall remain privileged and confidential and shall not be disclosed to any person or party except as may be required to carry out and complete this project or as may be compelled by any law, regulation, rule, order, ordinance, court or administrative or legislative body of competent jurisdiction. Upon completion of this project and payment in full to AWH of all of its fees charged and expenses incurred in connection with this engagement, the foregoing non-disclosure obligation shall terminate.

In a letter marked "Privileged and Confidential" and also dated October 19, 1993, Huyghe submitted a proposed budget estimate of $340,000.00 to $400,000.00. The estimate expressly excluded "preparation for or the provision of expert testimony."

Meanwhile, Formosa changed outside counsel in December of 1993. New counsel met with Huyghe on December 3, 1993. Huyghe provided the new lawyers a copy of the indices AWH–C had prepared of the Kajima documents. The expert solicited retention on the remainder of the work, representing that Hutchison would be available to testify as an expert. However, instead of retaining Huyghe, Formosa's new counsel instructed Huyghe not to do any further work. By letter in April of 1994, Formosa's new law firm confirmed with Huyghe that AWH–C's services were no longer needed:

After we spoke last week I visited with Ken Alexander about Hutchison's role in the above referenced case. The net result is that you should consider yourself indefinitely on "hold".

Although I would be happy to listen to your presentation if you are ever in Houston, we do not need to use your services at this time. If and when the circumstances change, I will contact you.

The letter did not mention confidentiality or non-disclosure. On April 15, 1994, Huyghe confirmed with Formosa's new counsel that the Formosa work was "on hold."

In August of 1994, Kajima's counsel approached Huyghe about consulting with Kajima in this lawsuit. Huyghe informed Formosa's former counsel of the contact and potential retention. Formosa's former counsel testified:

He had called me and told me that he was—had been approached by Kajima to represent or to be an expert for Kajima and did I think that that was going to be a problem based on the amount of work that they had done for us. And, I told him that I thought that it could be, that we were no longer the attorney for Formosa, and that I would talk to the partners in my firm, which I did. Mr. Huyghe and I had one other conversation about it. He told me that the conversations that he had had with Kajima had been very cursory, that they had just been approached by it, that he thought they were talking to some other people, wasn't sure they'd even be retained and there wasn't any sense in going in and kind of stirring up the hornets' nest until he found out if they were going to be retained. I told him that I thought he ought to contact [Formosa's new counsel], because [they] were now their attorney, and he ought to find out whether or not that was going to be a conflict. . . . I told him that I thought he'd been too involved in this case and I probably said knew some things that I thought it would make it difficult for him to represent the other side.

There is no evidence in the record of any actions taken at that time by Formosa's

former counsel or by Formosa in response to Huyghe's disclosure of the contact by Kajima. Huyghe did not contact Formosa's new counsel regarding Kajima's approach. Nor did Formosa's new counsel contact Huyghe.

On August 9, 1994, Kajima's counsel sent a letter to Huyghe confirming their initial discussions:

> As we discussed, we want to be absolutely certain and comfortable with the fact that there is no conflict of interest on your part. Based on the facts that you described to me, I do not believe that there would be.

> As we also discussed, I would like you to be sure to review your files and speak to all those involved in your preliminary discussions with Formosa's prior counsel to make sure that there is nothing that would remotely suggest the existence of conflict.

> I am in the process of preparing a conflict certification for you to sign which will basically certify that there is no conflict of interest, that you have not received any confidential information from Formosa and that you agree to keep all information provided to you by Kajima in connection with this matter confidential.

The record also contains a "Conflict Certification," in affidavit form, dated August 11, 1994 and signed by Huyghe as president of A.W. Hutchison & Associates, Inc. In the "Conflict Certification," Huyghe attested:

> I hereby certify that A.W. Hutchison & Associates, Inc. has not received any confidential information from any Formosa entity or from its counsel related in any manner to this litigation.

The "Conflict Certification" further represented:

> I hereby further certify that A.W. Hutchison & Associates, Inc. has not prepared any analysis of damages in this case for Formosa and had not been hired by Formosa in this case to act as an expert witness.

In late September 1995, Kajima disclosed in discovery responses to Formosa that it had hired Hutchison as an expert witness. On October 4, 1995, Formosa filed its motion to strike the expert for "side-switching." At that time, Huyghe provided to Kajima's counsel copies of letters and billings between AWH–C and Formosa's counsel. After a hearing, the trial court denied the motion to strike.

### (4) The Burden of Proof of Confidentiality and Non–Waiver

Generally speaking, the party asserting that information disclosed to a third party is protected by the attorney-client privilege has the burden of proving no waiver occurred in communicating the information to the third party. *See Jordan v. Fourth Court of Appeals*, 701 S.W.2d 644, 649 (Tex.1985) (orig.proceeding). In the context of expert disqualification based on "side-switching," courts in other jurisdictions have held that the party seeking disqualification bears the burden of establishing both the existence of confidentiality and its non-waiver. *See, e.g., United States ex rel. Cherry Hill Convalescent Ctr., Inc. v. Healthcare Rehab Sys., Inc.*, 994 F.Supp. 244, 249 (D.N.J.1997); *Cordy v. Sherwin–Williams Co.*, 156 F.R.D. 575, 580 (D.N.J.1994); *English Feedlot, Inc. v. Norden Labs., Inc.*, 833 F.Supp. 1498, 1501–02 (D.Colo.1993). Accordingly, Formosa bears the burden of establishing both the existence of confidentiality in its consultation with Huyghe and its non-waiver of any confidentiality that attached to the information it conveyed to the expert or to

the expert's work product. *See Jordan,* 701 S.W.2d at 649.

Waiver occurs when a party either intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right. *See Tenneco, Inc. v. Enter. Prod. Co.,* 925 S.W.2d 640, 643 (Tex.1996); *Sun Exploration & Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex. 1987). A party may expressly renounce a known right and waive it. *See Tenneco, Inc.,* 925 S.W.2d at 643. A party's silence or inaction, for so long a period that it shows an intention to yield the known right, is also enough to prove waiver. *See id.* I first determine if Formosa met its burden of proving non-waiver.

### (5) Waiver Analysis

Formosa had at least five opportunities to establish with Huyghe that AWH–C and Huyghe were to maintain the confidentiality of any information acquired and work product generated on Formosa's behalf. First, Formosa's in-house counsel could have addressed the confidentiality issue when Huyghe initially solicited the consultation from Formosa. In-house counsel did not. Second, Formosa's outside counsel could have insisted on confidentiality when Huyghe met with Formosa's first set of lawyers. Outside counsel did not. This omission is particularly significant in light of Huyghe's letter to outside counsel confirming that AWH–C had been involved in another Kajima project to the extent that its "working knowledge of Kajima ... could be advantageous should negotiations occur." The solicitation letter evidences Formosa's knowledge, throughout the course of this litigation, of a previous working relationship between the expert and Kajima. Third, Formosa's counsel could have insisted on confidentiality when they transmitted documents to Huyghe for analysis and when they received the indi-

ces and other documents that comprised AWH–C's work product. Again, Formosa's initial outside counsel did not. Fourth, at the time Formosa's new counsel declined any further services and instructed Huyghe to put the work "on hold," counsel could have instructed Huyghe that Formosa considered confidential all information AWH–C and Huyghe had received and all work product generated on Formosa's behalf. Formosa's new outside counsel did not. This omission is particularly significant in light of Formosa's rejection of Huyghe's retention agreement, which contained an express confidentiality and non-disclosure clause and, in fact, provided that any duty of non-disclosure terminated when the consultation concluded. Finally, when Huyghe reported the initial contact by Kajima, Formosa or its counsel could have objected specifically to any retention of Hutchison by Kajima and unequivocally asserted the confidentiality of any information AWH–C received or work product it generated. No one did. AWH went on to accept Kajima's retention and ultimately performed thousands of hours of work and billed almost a million dollars in consulting fees in this litigation.

I note that some cases that address the "side-switching" of experts suggest an obligation on the part of the expert to "take care to avoid conduct that contributes to a lack of clarity about the relationship." *See, e.g., Wang Labs., Inc., v. Toshiba Corp.,* 762 F.Supp. 1246, 1250 (E.D.Va. 1991). Nonetheless, as noted by one of the cases relied on by Formosa, the primary burden remains with the attorney to establish a reasonable basis for concluding that the expert understood the confidential nature of the relationship. *Paul v. Rawlings Sporting Goods Co.,* 123 F.R.D. 271, 279 (S.D.Ohio 1988). The *Paul* court reasoned:

> Of the two participants in an attorney-expert relationship ..., the attorney, be-

ing an expert in legal matters, should be more aware both of the potential for privileged information to pass to the expert, and for the need to insure [sic] against such information finding its way into the hands of an adversary. Consequently, [it is not] unfair to place the burden of making sure that the expert understands the type of relationship which exists, and the need to keep information disclosed during the course of that relationship confidential, on the attorney in the first instance. *Id.*

Further, Formosa does not dispute that it provided the document indices created by AWH–C to its testifying expert. The facts known to an expert and underlying the expert's mental impressions and opinions related to a case are discoverable "regardless of when and how the factual information was acquired." TEX.R. CIV. P. 192.3(e)(3); *see Aetna Cas. & Sur. Co. v. Blackmon*, 810 S.W.2d 438, 440 (Tex.App.-Corpus Christi 1991, orig. proceeding) (holding that designation of party employee as testifying expert waived attorney-client, work product, and party communication privileges as to the privileged information the expert relied on in forming mental impressions and opinions related to case).

Accordingly, I would hold that Formosa has not met its burden of proving non-waiver of its claim of confidentiality over the information it provided to and the work product created by Huyghe and AWH–C. *See Jordan*, 701 S.W.2d at 649; *see also Mitchell v. Wilmore*, 981 P.2d 172, 176 (Colo.1999) (citations omitted) ("The discussion of mere technical information about a case does not meet a party's burden under this framework. Nor is disqualification [of an expert] appropriate where

the confidentiality of the information has been legally waived or if the information claimed to be confidential is actually routinely discoverable.").

I would overrule the first part of Formosa's third issue. Having found that Formosa did not meet its burden of proving non-waiver, I would not address whether the information provided by Formosa to Huyghe was confidential or whether Huyghe actually or conclusively is presumed to have shared confidential information with Hutchison.[4] *See* TEX.R.APP. P. 47.4.

### 2. *Evidence of Mitigation*

#### a. *The Issue on Appeal*

In its fifth issue, Formosa asserts that the trial court erred in excluding evidence that Kajima, not Formosa, caused much of its own losses. Formosa relies on *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex.1997):

> We emphasize that a plaintiff's recovery of damages is limited not only by his own evidence, but also by the defendant's evidence of the plaintiff's failure to reasonably mitigate losses or evidence of intervening causes. If a plaintiff's losses are attributable to his own mistakes or factors outside either of the parties' control, the defendant may be entitled to an appropriate limiting instruction to the jury.

*Id.* (citations omitted). Formosa contends that it properly pleaded the defense of mitigation, but the trial court refused, over Formosa's objection, to permit development of evidence of Kajima's "self-inflicted" losses to the jury. Formosa argues that the trial court repeatedly prohibited it from examining witnesses about Kajima's

4. My conclusion that the abuse-of-discretion standard of review applicable to attorney disqualification proceedings also applies to expert disqualification should not be read as adopting attorney conflict-of-interest standards to experts.

bid omissions and other mitigating causes that inflated Kajima's damages. Specifically, Formosa attempted at trial to cross-examine Hutchison about how he accounted for Kajima's bid omissions when he prepared his damages calculations. However, the trial court sustained Kajima's objections to the questions because the court agreed that the bid omissions were irrelevant to the reasonable value of Kajima's work. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs.*, 960 S.W.2d 41, 49–50 (Tex.1998).

Kajima argues that the trial court concluded that mitigation evidence was not relevant after Kajima nonsuited its contract claims. The proper fraud measure of damages, Kajima maintains, is out-of-pocket loss, or the difference between the reasonable value of the work Kajima performed and what it received. Bid omissions do not factor into the fraud measure of damages, Kajima concludes.

Formosa also contends that the trial court abused its discretion in excluding testimony of other causes of Kajima's losses, such as mismanagement, overcharges, and theft by Kajima personnel. Kajima responds that the party who caused a loss bears the burden of proving lack of diligence on the part of the plaintiff as well as the amount by which the damages were increased by the failure to mitigate. *See Lester v. Logan*, 893 S.W.2d 570, 577 (Tex. App.-Corpus Christi 1994, writ denied). Kajima argues that Formosa does not in its brief cite to any evidence showing an increase in the amount of damages created by Kajima's failure to mitigate.

### b. The Evidentiary Standard of Review

The trial court determines preliminary questions about admitting or excluding evidence. Tex.R. Evid. 104(a). Whether to admit or exclude evidence is a matter com-

mitted to the trial court's sound discretion. *State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 647 (Tex.2001). A trial court abuses its discretion when it acts without regard to any guiding rules or principles. *Id.* (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985)).

### c. Mitigation Analysis

#### (1) Evidence of Bid Omissions

In support for its position that bid omissions were not relevant to the fraud measure of damages, Kajima cites *Presidio*, which held:

[T]he out-of-pocket measure only compensates for actual injuries a party sustains through parting with something, not loss of profits on a bid not made, and a profit never realized, in a hypothetical bargain never struck. Thus, the $1.3 million hypothetical bid less the $600,000 actually received is not probative of Presidio's out-of-pocket loss. The proper out-of-pocket calculation of damages, based on Burnette's testimony, was $831,000 less the amount he actually received, $600,000, for damages of $231,000.

*Presidio*, 960 S.W.2d at 49–50 (footnote omitted). Applying *Presidio's* logic to the facts of this case, I would hold that the trial court did not abuse its discretion in excluding evidence of Kajima's bid omissions. *See id.*

#### (2) Other Evidence of Mitigation

To preserve an error related to exclusion of the testimony of a witness, a party must offer proof or a formal bill of exceptions. Tex.R.App. P. 33.2; Tex.R. Evid. 103(a)(2). In that offer or bill, the party must specify what the proffered witness would testify to if allowed to testify. Tex.R. Evid. 103(a)(2). Only by such measures may the failure to allow testimo-

ny be preserved. *Fletcher v. Minn. Mining & Mfg. Co.*, 57 S.W.3d 602, 606–07 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). In this case, Formosa submitted offers of proof of the testimony of a number of witnesses. However, Formosa does not cite in its briefs to any record in its offers of proof where it developed evidence of damages. *See* Tex.R.App. P. 38.1(h). Having examined each of the offers of proof and finding no evidence of the amount by which Formosa claims Kajima increased its own damages, I would hold that Formosa did not preserve error over its challenge to the trial court's exclusion of testimony of other causes of Kajima's damages. *See Fletcher*, 57 S.W.3d at 606–07. Accordingly, I would overrule Formosa's fifth issue. *See Rivas v. Cantu*, 37 S.W.3d 101, 118 (Tex.App.-Corpus Christi 2000, pet. denied) (noting that "out-of-pocket measure computes the difference between the value paid and the value received"); *see also Duperier v. Tex. State Bank*, 28 S.W.3d 740, 754 (Tex.App.-Corpus Christi 2000, pet. dism'd by agmt.) (noting that "injured party in a fraud case has no duty to minimize damages resulting from the fraud" in holding that mitigation is no defense to violation of Texas Securities Act).

I turn to Formosa's challenge to the trial court's partial summary judgment on single-business-enterprise grounds.

## B. Single–Business–Enterprise Partial Summary Judgment

### 1. The Issue on Appeal

In the first part of issue seven, Formosa asserts that the trial court's granting of Kajima's traditional motion for summary judgment that Formosa USA and Formosa Texas operated as a single business enterprise was error. Formosa contends that actual fraud is required for a finding of a single business enterprise. *See* Tex. Bus.

Corp. Act Ann. art. 2.21(A)(2) (Vernon 2003) (prohibiting imposition of liability on corporate affiliate in absence of showing that affiliate caused corporation to be used for purpose of perpetuating and did perpetuate actual fraud primarily for direct personal benefit of affiliate). Formosa argues that Kajima did not submit summary-judgment evidence that Formosa USA and Formosa Texas engaged in a single business enterprise to perpetrate fraud. Kajima responds that proof of fraud is not required to recover on a single-business-enterprise finding. *See N. Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 119 (Tex.App.-Beaumont 2001, pet. denied).

Formosa also asserts that whether a single business enterprise exists presents a fact issue for the jury. *See Castleberry v. Branscum*, 721 S.W.2d 270, 277 (Tex. 1986). Kajima responds that the trial court properly determined the single-business-enterprise issue as a matter of law. *See Allright Tex., Inc. v. Simons*, 501 S.W.2d 145, 150 (Tex.Civ.App.-Houston [1st Dist.] 1973, writ ref'd n.r.e.); *see also Murphy Bros. Chevrolet Co. v. E. Oakland Auto Auction*, 437 S.W.2d 272, 276 (Tex. Civ.App.-El Paso 1969, writ ref'd n.r.e.).

Formosa further contends that its summary-judgment evidence raised a material fact issue as to whether Formosa USA and Formosa Texas operated as a single business enterprise. Kajima counters that Formosa's summary-judgment evidence did not raise any issue of material fact, arguing that the only summary-judgment evidence Formosa submitted did not identify any relevant time period.

### 2. The Summary–Judgment Standard of Review

The standard of review for the grant of a motion for summary judgment is determined by whether the motion was brought on no-evidence or traditional grounds. *See*

Tex.R. Civ. P. 166a(i), (c); *see also Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 771 (Tex.App.-Corpus Christi 2003, no pet.) (op. on reh'g). We review de novo a trial court's grant or denial of a traditional motion for summary judgment. *Ortega*, 97 S.W.3d at 772. The movant bears the burden of showing both no genuine issue of material fact and entitlement to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *see also Ortega*, 97 S.W.3d at 771. In deciding whether there is a genuine issue of material fact, we take evidence favorable to the non-movant as true. *Ortega*, 97 S.W.3d at 771. We make all reasonable inferences and resolve all doubts in favor of the non-movant. *Id.*

### 3. The Summary–Judgment Evidence

Kajima presented summary-judgment evidence that agents of Formosa USA represented to Kajima that Formosa USA owned the Point Comfort facility. Kajima also presented summary-judgment evidence that Formosa Texas is the owner of record of the facility, even though it had no authority over the construction of its plant. Other summary-judgment evidence showed that Formosa Texas had no power to approve construction change orders in excess of $5,000.00. A change order in excess of $50,000.00 had to be approved by Formosa USA's executive vice-president, Susan Wang, who also was Formosa Texas's executive vice-president. All change orders more than $5,000.00 but less than $50,000.00 had to be approved by Formosa USA's assistant vice president, L.F. Pan. Kajima also presented summary-judgment evidence that Glenn Dobbs, an employee of Formosa Texas, performed bid analyses for Formosa USA on the Point Comfort construction project. Other evidence established that the principal place of business for Formosa USA during the contract negotiation and construction phases of the Point Comfort project was 9 Peach Tree Hill Road, Livingston, New Jersey 07039, which also was Formosa Texas's designated principal office address during that time. Also during the contract negotiation and construction phases of the Point Comfort project, Robert Hsueh and Simon Chang, both employees of Formosa Texas, reported to L.F. Pan, employed by Formosa USA. The director of legal services for Formosa Texas, Camp Mehrens, reported to Jack Wu, an officer of both Formosa Texas and Formosa USA. Another employee, Jack Huang, testified he was not sure if he worked for Formosa USA or Formosa Texas on the Point Comfort project. Yet another employee, Jeff Tseng, testified he did not understand the differences between Formosa USA and Formosa Texas.

As its summary-judgment proof, Formosa presented a two-page affidavit that identified the affiant, Alice Nightingale, as the corporate secretary for Formosa USA and Formosa Texas since January 10, 1992. Nightingale's affidavit is dated December 11, 2001. Nightingale stated that Formosa Texas and Formosa USA: (1) have separate principal business addresses, (2) have separate telephone numbers, (3) file separate state franchise tax returns, (4) contract for purchases and sales separately, and (5) maintain separate real property ownership. The affidavit does not recite that the facts were true and correct during the contract negotiation and construction phases of the Point Comfort project.

### 4. The Law of Single Business Enterprise

Separate corporations operate as a single business enterprise when they do not operate as separate entities but rather integrate their resources to achieve a common business purpose. *Paramount Petroleum Corp. v. Taylor Rental Ctr.*, 712

S.W.2d 534, 536 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.); *see also Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 594 (5th Cir.1999). Each constituent corporation may be held responsible for the liabilities of the other if they operate as a single business enterprise. *Paramount Petroleum Corp.*, 712 S.W.2d at 536; *Gardemal*, 186 F.3d at 594. Elements relevant to a finding of a single business enterprise include: (1) common employees, (2) common offices, (3) centralized accounting, (4) payment of wages by one corporation to another corporation's employees, (5) common business name, (6) services rendered by employees of one corporation on behalf of another corporation, (7) undocumented transfers of funds between corporations, and (8) unclear allocation of profits and losses between corporations. *Bridgestone Corp. v. Lopez*, 131 S.W.3d 670, 682 (Tex.App.-Corpus Christi 2004, pet. filed) (citing *El Puerto de Liverpool v. Servi Mundo Llantero S.A. de C.V.*, 82 S.W.3d 622, 637 (Tex.App.-Corpus Christi 2002, pet. dism'd w.o.j.) (op. on reh'g); *Paramount Petroleum Corp.*, 712 S.W.2d at 536.).

### 5. Analysis of Single–Business–Enterprise Partial Summary Judgment

Proof of fraud as a separate element is not required to recover on a single-business-enterprise finding. "To recover under a finding of a single business enterprise, no proof of fraud is required; instead, the single business enterprise theory relies on equity analogies to partnership principles of liability." *Bridgestone Corp.*, 131 S.W.3d at 682 (quoting *Emmons*, 50 S.W.3d at 119). The record supports Kajima's argument that the summary-judgment evidence it presented conclusively established as a matter of law that Formosa USA and Formosa Texas integrated their resources to achieve the common business purpose of completing the Point Comfort construction project. Kajima's summary-judgment evidence showed that during the contract negotiation and construction phases of the Point Comfort project: (1) Formosa USA and Formosa Texas had common employees; (2) Formosa USA and Formosa Texas had common offices; (3) the two corporations shared "Formosa" in their respective corporate names; (4) employees of one corporation rendered services for the other corporation; and (5) the two corporations had merged accounting functions to the extent they related to approval of construction change orders with regard to the project. *See Bridgestone Corp.*, 131 S.W.3d at 682.

On the other hand, Formosa's summary-judgment evidence only provided evidence of the relationship between the two corporations on the date of the affidavit in 2001, not during the contract negotiation and construction phases of the project from 1991 through 1993. I note that the affidavit identifies Nightingale as an employee of both corporations, lending support to Kajima's position. Further, the affidavit establishes that Nightingale's tenure as a corporate secretary for the corporations did not begin until January 10, 1992, after the contract negotiation phase of the Point Comfort project began. Thus, Nightingale's affidavit did not raise any fact issue to controvert the commonalities between the two corporations during the contract negotiation and construction phases of the Point Comfort project shown by Kajima's summary-judgment evidence.

Accordingly, taking the summary-judgment evidence favorable to Formosa as true and making all reasonable inferences and resolving all doubts in Formosa's favor, I would hold that Kajima met its burden of showing both no genuine issue

of material fact and entitlement to partial judgment as a matter of law on the issue of single business enterprise. *See* TEX.R. CIV. P. 166a(c); *see also Ortega,* 97 S.W.3d at 772. Thus, I would overrule the first part of issue seven.

### C. The Jury Charge

#### 1. The Alleged Charge Error

In a subissue within issue six, Formosa claims that the trial court abused its discretion in not instructing the jury on mitigation. Within issue seven, Formosa asserts that the trial court abused its discretion in instructing the jury that Formosa USA and Formosa Texas operated as a single business enterprise. Formosa also contends, in issue four, that the trial court abused its discretion in not charging the jury on ratification. In issue two, Formosa challenges the trial court's submission of a single broad-form fraud liability question rather than submission of a fraud liability question that required a jury finding as to each of the five contracts.

#### 2. Charge Error Standard of Review

The standard of review for error in a jury charge is abuse of discretion. *In re V.L.K.,* 24 S.W.3d 338, 341 (Tex.2000); *R & R Contrs. v. Torres,* 88 S.W.3d 685, 696 (Tex.App.-Corpus Christi 2002, pet. dism'd). We accord the trial court broad discretion so long as the charge is legally correct. *Hyundai Motor Co. v. Rodriguez,* 995 S.W.2d 661, 664 (Tex.1999). If a party timely raises a proper request that a matter be included in the jury charge, we cannot permit a judgment to stand when the trial court refuses to submit a valid theory of recovery or a vital defensive issue that the pleadings and evidence fairly present. *Exxon Corp. v. Perez,* 842 S.W.2d 629, 631 (Tex.1992) (per curiam).

#### 3. Instructions

When the trial court refuses to submit a requested instruction, the question on appeal is whether the requested instruction was reasonably necessary to enable the jury to reach a proper verdict. *R & R Contrs.,* 88 S.W.3d at 696 (citing *Tex. Workers' Comp. Ins. Fund v. Mandlbauer,* 34 S.W.3d 909, 912 (Tex.2000) (per curiam)); *see* TEX.R. CIV. P. 277. A trial court has considerably more discretion in submitting instructions and definitions than it has in submitting questions. *Ed Rachal Found. v. D'Unger,* 117 S.W.3d 348, 364 (Tex.App.-Corpus Christi 2003, pet. filed) (en banc) (citing *Harris v. Harris,* 765 S.W.2d 798, 801(Tex. App.-Houston [14th Dist.] 1989, writ denied)).

#### a. Mitigation

I already have concluded that the trial court did not abuse its discretion in excluding evidence of Kajima's bid omissions as not relevant to Kajima's fraud claim. I also have concluded that Formosa did not preserve error by bill of exception or offer of proof of any increase in the amount of damages it contended Kajima caused by mismanagement, overcharges, theft, or other mitigating factors. I find that the evidence did not support submission of a mitigation instruction. *See Elbaor v. Smith,* 845 S.W.2d 240, 243 (Tex.1992) (holding that trial court may refuse to submit jury question if no evidence warrants its submission). Formosa suggests that Hutchison's expert testimony that Kajima expended $3,330,547.00 in costs that did not add value to the project supported submission of a mitigation instruction. However, the amount of costs Kajima expended that did not add value to the project was a factor Hutchison took into account in calculating the reasonable value of the work Kajima performed. I conclude that a mitigation instruction was not rea-

sonably necessary to enable the jury to reach a proper verdict. *See R & R Contrs.*, 88 S.W.3d at 696. Accordingly, I would hold that the trial court did not abuse its discretion in refusing to instruct the jury on mitigation. *See id.* Thus, I would overrule Formosa's fourth issue.

### b. Single Business Enterprise

An explanatory instruction is improper only if it is a misstatement of the law as applicable to the facts. *D'Unger*, 117 S.W.3d at 364. I already have concluded that Kajima met its burden of showing both no genuine issue of material fact and entitlement to partial judgment as a matter of law on the issue of single business enterprise. Thus, a single-business-enterprise instruction was reasonably necessary to enable the jury to reach a proper verdict. *See R & R Contrs.*, 88 S.W.3d at 696. Accordingly, I would hold that the trial court did not abuse its discretion in instructing the jury to consider Formosa Texas and Formosa USA as a single business enterprise. *See id.* Thus, I would overrule the second part of issue seven.

### 4. Jury Questions

#### a. Ratification

Formosa contends it timely submitted a proper ratification jury question that instructed that ratification occurs when a defrauded party: (1) continues to accept benefits under the contract after it became aware of the fraud or recognizes the contract is binding, (2) with full knowledge of the fraudulent act at the time of the ratification, and (3) intends to ratify the contract in spite of the fraud. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 676 n. 1 (Tex.2000). Formosa argues that the evidence showed that Kajima recognized in March 1992 that it would lose $25 million unless it cancelled the contracts and walked off the job. Kajima's decision

to go forward even though it knew that it would cost $25 million to complete the contracts, Formosa argues, evidences Kajima's acknowledgment of the alleged fraud and constitutes ratification. Kajima responds that Formosa had the burden to produce evidence that Kajima acted with full knowledge of the fraud and of all material facts to entitle it to any ratification instruction. Formosa produced no such evidence, Kajima argues, because of the ongoing nature of the "string-along" fraud perpetrated by Formosa, that is, its post-contract assurances of payment for overages as inducement for continued performance. Accordingly, Kajima concludes, Formosa was not entitled to a ratification question. Kajima also asserts that Formosa's ratification question was not in the substantially correct form because it did not allow the jury to consider Formosa's post-contract fraud. Rather, Kajima argues, as submitted Formosa's ratification question invited the trial court to commit the same charge error we reversed and remanded for a new trial in *Kajima I*. *See Kajima I*, 15 S.W.3d at 291.

No general rule guides the analysis of what acts of ratification will or will not waive fraud in the inducement. *Fortune Prod. Co.*, 52 S.W.3d at 678–79 (and cited authorities). I first note that the supreme court held in *Fortune Prod. Co.* that only the plaintiffs who continued to perform after the fraudulently induced contracts expired were precluded from recovering damages for the fraud. *Id.* at 680. On the other hand, the supreme court permitted recovery of fraud damages by those plaintiffs who continued to perform binding contracts for a stated term after they learned of the fraud that induced those contracts. *Id.* at 679. I conclude that ratification of fraud occurs if "the fraud no longer induce[s] the performance." *Id.* at 680. The burden was on Formosa to

prove that Kajima had full knowledge of the ongoing fraud and made a voluntary, intentional choice to ratify the transactions in light of that knowledge. *See Arroyo Shrimp Farm v. Hung Shrimp Farm*, 927 S.W.2d 146, 153 (Tex.App.-Corpus Christi 1996, no writ). I find that Formosa introduced no evidence of a point at which its fraud no longer induced Kajima's performance so as to support submission of a ratification question. *See Elbaor*, 845 S.W.2d at 243. I would hold that the trial court did not abuse its discretion in refusing to charge the jury on ratification. *See R & R Contrs.*, 88 S.W.3d at 696. I would overrule Formosa's fourth issue.

### b. Broad–Form Fraud Question

In issue two, Formosa challenges the trial court's submission of a single broad-form fraud liability question rather than submission of a fraud liability question that required a jury finding as to each of the five contracts.[5] Formosa argues that the broad-form submission made it impossible for Formosa to challenge the legal or factual sufficiency of the evidence to support the jury's damages finding since the damages finding cannot be traced to any one contract. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex.2000) ("When a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding."). Kajima responds that *Casteel* only prohibits the broad-form submission of separate theories of liability, not broad-form submission of only one theory of lia-

bility, in this case fraud. *See id.* Kajima also points out that the "law of the case" established by *Kajima I* mandated the broad-form submission. *See Kajima I*, 15 S.W.3d at 291. Formosa counters that our prior holding only required submission on remand of a jury question that permitted the jury to consider post-contract fraud as well as fraud in the inducement, not submission of a broad-form fraud liability question that did not differentiate between the contracts. However, our prior holding required the trial court to submit a broad-form fraud question that permitted the jury to take Formosa's post-contract fraud into account. *See id.* I would hold that the trial court did not abuse its discretion in refusing Formosa's submitted fraud question that required a liability finding as to each separate contract. *See R & R Contrs.*, 88 S.W.3d at 696. I would overrule Formosa's second issue.

### D. Sufficiency of the Evidence of Damages

In the second part of issue three, Formosa claims that Hutchison's opinions constitute no evidence of damages. Similarly, Formosa asserts as a subissue of issue six that Kajima's out-of-pocket losses could not have exceeded half of the amount the jury found. Focusing on the admittedly striking numerical sequence in the jury's damages finding of $15,432,123.45, Formosa asserts in issue one that the evidence is legally and factually insufficient to support the jury's award of fraud damages.

### 1. Sufficiency Standards and Scope of Review

Under a proper measure-of-damages instruction, a fact finder has the discretion

---

**5.** Kajima argues that Formosa's oral on-the-record objections after the charge conference did not specify this particular objection. The record indicates that Formosa, after dictating oral objections, also confirmed on the record that the trial court had refused all of its re-

quested issues and instructions. The clerk's record reflects that the trial court refused a written fraud liability issue submitted by Formosa that requested a separate finding as to each contract.

to find damages within the range of evidence presented at trial. *See Gulf States Utils. Co. v. Low,* 79 S.W.3d 561, 566 (Tex. 2002). When an appellant challenges the legal sufficiency of a damages award, we consider only the evidence and inferences that support the fact finder's damages finding. *See D'Unger,* 117 S.W.3d at 354. We disregard all evidence and inferences to the contrary. *Id.* The appellant must show that the record presents no probative evidence to support the adverse finding. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). The evidence is no more than a scintilla and, in legal effect, is no evidence "when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence." *Kindred v. Con/Chem., Inc.,* 650 S.W.2d 61, 63 (Tex.1983). Conversely, more than a scintilla exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex. 1994).

Unlike legal-sufficiency challenges, factual-sufficiency issues concede that the record presents conflicting evidence on an issue. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.,* 766 S.W.2d 264, 275 (Tex.App.-Amarillo 1988, writ denied). Like legal-sufficiency challenges, the standard of review on factual-sufficiency issues depends on the burden of proof at trial. *Id.* at 275. The party attacking a finding on which an adverse party bore the burden of proof must show that the record presents "insufficient evidence" to support the finding. *Gooch v. Am. Sling Co.,* 902 S.W.2d 181, 184 (Tex.App.-Fort Worth 1995, no writ). In reviewing an insufficient-evidence issue, we examine and consider all of the evidence, not just the evidence that supports the verdict, to see whether it supports or undermines the finding. *Maritime Overseas Corp. v. El-*

*lis,* 971 S.W.2d 402, 406–07 (Tex.1998). We set aside the finding for factual insufficiency if the "evidence adduced to support the vital fact, even if it is the only evidence adduced on an issue, is factually too weak alone to support it." *See Ritchey v. Crawford,* 734 S.W.2d 85, 86–87 n. 1 (Tex.App.-Houston [1st Dist.] 1987, no writ) (quoting Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L.Rev. 361, 366 (1960)).

### 2. Damages Sufficiency Analysis

I have already determined that the trial court properly admitted Hutchison's expert testimony as to Kajima's fraud damages. Hutchison testified that Kajima expended $38,717,854.00 in total costs in completing the project. He also testified Kajima expended $3,330,547.00 in costs that did not add value to the project. Formosa paid Kajima approximately $10,000,000.00 on the project. Hutchison concluded that Kajima's out-of-pocket damages equaled $25,387,380.00. This out-of-pocket damages calculation complies with the supreme court's measure-of-damages analysis in *Presidio. See Presidio,* 960 S.W.2d at 49. After observing all the evidence presented at trial and being charged on the proper measure of damages, the jury determined Kajima suffered $15,432,123.45 in damages.

I find more than a scintilla of evidence to support the jury's damages finding. *See Moriel,* 879 S.W.2d at 25; *see also Kindred,* 650 S.W.2d at 63. I do not find the evidence to be factually too weak to support the jury's damages finding. *See Ritchey,* 734 S.W.2d at 86–87 n. 1. The jury's damages finding was within the range of evidence presented at trial and within the jury's discretion. *See Gulf States Utils. Co.,* 79 S.W.3d at 566. I would hold the evidence legally and factually sufficient to support a jury award of

$15,432,123.45. *See id.* Thus, I would overrule Formosa's first issue, the second part of its third issue, and the second part of its sixth issue.

### E. Jury Examination of Documentary Evidence

In issue eight, Formosa challenges the trial court's refusal to permit examination by the jury of plans and specifications entered into evidence. Rule 281 of the Texas Rules of Civil Procedure sets out that the jury "may, and on request shall, take with them in their retirement ... any written evidence.... Where part only of a paper has been read in evidence, the jury shall not take the same with them, unless the part so read to them is detached from that which is excluded." TEX.R. CIV. P. 281. Rule 281 is mandatory. *First Employees Ins. Co. v. Skinner*, 646 S.W.2d 170, 172 (Tex.1983). The trial court is required to send all exhibits admitted into evidence to the jury room during the deliberations. *Id.* The rule is self-operative and requires no request from the jurors or counsel. *Id.*

If the drawings described by Formosa were admitted into evidence, the trial court, by refusing to submit the drawings to the jury during deliberations, would have acted without reference to guiding rules and principles by ignoring rule 281. This would be an abuse of discretion. *See Downer*, 701 S.W.2d at 241–42. However, Formosa does not establish on appeal that the exhibit containing the drawings was admitted into evidence. Formosa cites only to the volumes of the appellate record that include the drawings, not to any portion of the record showing the admission of those drawings into evidence. Further, even if the trial court initially admitted the drawings into evidence pursuant to the parties' rule 11 agreement, it later ruled that the post-contract drawings comprising part of the evidence were irrelevant and inadmissible. Thus, the trial court expressly withdrew post-contract drawings from evidence, but exactly which drawings is not clear from the record. Formosa does not complain of the trial court's evidentiary ruling, only that the trial court did not send the documents into the jury room during deliberations. Formosa cannot contend now that any pre-contract drawings were erroneously withheld from the deliberating jury as a result of the trial court's ruling on the post-contract drawings. Formosa, the party offering the evidence, had the burden of excising the inadmissible portions from the evidence so that the admissible portion could be submitted to the jury. *See Am. Gen. Fire & Casualty Co. v. McInnis Book Store*, 860 S.W.2d 484, 488 (Tex.App.-Corpus Christi 1993, no pet.). "The objecting party ... must provide a reviewing court with a record that shows that the objectionable portion of the evidence was clearly identified either in the objection or in the ruling of the trial court." *Id.* Formosa does not do so, nor has it provided specific citation in the record to the post-contract documents to which its issue on appeal applies. I would hold that Formosa waived on appeal its complaint that the trial court did not comply with rule 281. *See* TEX.R.APP. P. 38.1(h). Thus, I would decline to address Formosa's eighth issue.

### F. Prejudgment Interest

Finally, Formosa claims in issue nine that the judgment awarded Kajima excessive prejudgment interest. In its appellant's brief, Formosa asserts that section 304.105 of the Texas Finance Code applies to Kajima's fraud claim through the supreme court's holding that specific provisions of chapter 304 apply to certain common-law cases. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531–32 (Tex.1998); *see also*

TEX. FIN.CODE ANN. § 304.105(a) (Vernon Supp.2004) ("If judgment for a claimant is more than the amount of a settlement offer of the defendant, prejudgment interest does not accrue on the amount of the settlement offer during the period the offer may be accepted."). Formosa has not cited any authority that applies chapter 304 to fraud claims, and I have found none. I would decline Formosa's invitation to extend *Johnson & Higgins* to fraud claims. Thus, I would overrule Formosa's ninth issue.[6]

### III. CONCLUSION

I would affirm the judgment of the trial court.

YAÑEZ, Justice, dissenting.

The majority holds that appellant, Formosa Plastics Corporation, USA ("Formosa"), failed to meet its burden for disqualifying Kajima's expert witness, A.W. "Chip" Hutchison ("Hutchison"). Because I would hold that the trial court erred in refusing to disqualify Hutchison on the basis of "side-switching," I would sustain Formosa's third issue, reverse the trial court's judgment, and remand for a new trial. Accordingly, I respectfully dissent.

### I. Background

In 1993, Kajima sued Formosa for breach of contract, fraud, quantum meruit, and negligent representation arising from

construction contracts for work Kajima performed at Formosa's expansion plant project in Point Comfort, Texas.[1] In 1997, following a jury trial, the trial court rendered judgment for Kajima for $5,591,066.65. Kajima appealed, contending, among other things, that the trial court erred in refusing to submit a broad form fraud question. This Court reversed and remanded to the trial court for a new trial. *See Kajima Int'l, Inc. v. Formosa Plastics Corp.*, 15 S.W.3d 289, 294 (Tex. App.-Corpus Christi 2000, pet. denied).

On remand, Kajima non-suited all of its claims except fraud. Following a jury trial, the trial court rendered judgment in favor of Kajima and awarded it $15,432,123.45 in actual damages, plus prejudgment interest of $14,210,269.65 and $403,156.86 in costs. This appeal followed.

### II. Disqualification of Kajima's Expert Witness

#### A. Background Facts of "Side-Switching" Issue

In its third issue, Formosa contends the trial court erred in refusing to disqualify Hutchison as Kajima's expert witness because of "side-switching." In 1993, Formosa's former outside counsel, Jones, Day, Reavis & Pogue ("Jones Day"), retained Steve Huyghe, an associate of Hutchison's at A.W. Hutchison & Associates, Inc. ("AWH"),[2] and the firm, AWH, as Formo-

---

**6.** In its reply brief, Formosa raises for the first time as a subissue within issue nine that amendments adopted in 2003 to pre-judgment interest rates in Texas apply to this appeal. The briefing rules do not allow an appellant to include in a reply brief an issue not raised in appellant's original brief. TEX.R.APP. P. 38.3; *see In re A.M.*, 101 S.W.3d 480, 486 (Tex.App.-Corpus Christi 2002, orig. proceeding) (citing *Anderson Producing, Inc. v. Koch Oil Co.*, 929 S.W.2d 416, 424 (Tex.1996); *Barrios v. State*, 27 S.W.3d 313, 322 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd)). Formo-

sa did not seek leave to raise the new issue. I do not address Formosa's improperly raised issue. *See In re A.M.*, 101 S.W.3d at 486.

**1.** For a more detailed explanation of the background facts, see this Court's opinion in *Kajima Int'l, Inc. v. Formosa Plastics Corp.*, 15 S.W.3d 289, 294 (Tex.App.-Corpus Christi 2000, pet. denied).

**2.** At the trial in the present case, Hutchison testified that in 1993, he was the sole owner of A.W. Hutchison of California, then a whol-

sa's consulting experts in connection with the Kajima lawsuit. On October 4, 1993, Huyghe and an associate met with lawyers at Jones Day to discuss the suit. Over the next few months, Huyghe and AWH performed work for Formosa. By the end of December 1993, Formosa had paid AWH $20,875.89 for work done on the Kajima case.

In December 1993, Formosa transferred its defense from Jones Day to Porter & Hedges. On December 3, 1993, Huyghe met with lawyers from Jones Day and Porter & Hedges to discuss the case. In April 1994, Porter & Hedges told Huyghe that his work for Formosa was "on hold."

A few months later, in August 1994, Kajima's lead counsel, Steve Lownds, contacted Huyghe about AWH working on the case for Kajima. Huyghe notified Margaret Kelihar, an attorney at Jones Day, Formosa's former counsel, that he had been contacted by Kajima. Kelihar testified she told Huyghe his knowledge and involvement in the case "would make it difficult for him to represent the other side" and advised him to notify Porter & Hedges. Huyghe did not notify Porter & Hedges or Formosa. Lownds prepared a "conflict certification," which stated, "I hereby certify that A.W. Hutchison and Associates, Inc., has not received any confidential information from any Formosa entity or from its counsel related in any manner to this litigation." Huyghe testified that he signed the certification form, even though Lownds did not explain or provide a definition of "confidential information."

ly-owned subsidiary of A.W. Hutchison & Associates, Inc. Hutchison testified that he later merged A.W. Hutchison of California into A.W. Hutchison & Associates, Inc.

Formosa did not learn that Hutchison and Brian Rogers (also of AWH) had been designated as Kajima's testifying experts until September 19, 1995. Several weeks later, on October 4, 1995, Formosa filed a motion to strike Hutchison and AWH as Kajima's expert witnesses for "side-switching." Following a hearing, the trial court denied Formosa's motion.

### B. Kajima's Arguments

In response to Formosa's "side-switching" argument, Kajima argues the trial court was not required to disqualify Hutchison because: (1) even though Formosa initially shared some non-confidential information with Huyghe, who worked for A.W. Hutchison of California, no conflict exists between the work initially performed by Huyghe for Formosa and the work later performed by Hutchison for Kajima because Hutchison worked for AWH, a separate corporate entity based in Atlanta; (2) any information given to Huyghe by Formosa was discoverable and thus was not confidential; (3) Formosa did not directly share confidential information with Hutchison or Huyghe; and (4) the attorney vicarious-qualification rules do not apply to expert firms.

### C. Standard of Review and Applicable Law

We review a trial court's decision on whether to disqualify an expert witness for an abuse of discretion.[3] The test for an abuse of discretion is whether the trial court acted without reference to any guiding rules or principles.[4] A trial court has no discretion to determine what the law is or in applying the law to the facts.[5]

3. *See Koch Ref. Co. v. Jennifer L. Boudreaux MV,* 85 F.3d 1178, 1181 (5th Cir.1996).

4. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241 (Tex.1986).

5. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.

An appellate court is not obligated to give any particular deference to a trial court's legal conclusions.[6] We review questions of law de novo.[7]

Disqualification of an expert that switches sides in a lawsuit is an issue of first impression in Texas. However, the Fifth Circuit has addressed the test courts should apply when determining whether to disqualify an expert witness who has previously been retained to consult with another party.[8]

In *Koch*, the Fifth Circuit adopted the two-part test adopted by the majority of courts that have considered the issue: (1) was it objectively reasonable for the first party who claims to have retained the expert to conclude that a confidential relationship existed between that party and the expert; and (2) did the first party disclose any confidential or privileged information to the expert?[9]

Courts have the inherent power to disqualify experts.[10] That power derives from the necessity to protect privileges which may be breached when an expert switches sides, and from the necessity to preserve public confidence in the fairness and integrity of judicial proceedings.[11]

Accordingly, I agree with the majority's adoption of the two-part expert-qualification test outlined in *Koch*.[12] The party seeking disqualification bears the burden of proving both elements of the test.[13]

In *Koch*, the Fifth Circuit noted that in cases where an expert has switched sides,

> no one would seriously contend that a court should permit a consultant to serve as one party's expert where *it is undisputed* that the consultant was previously retained as an expert by the adverse party in the same litigation and had received confidential information from the adverse party pursuant to the earlier retention. This is a clear case for disqualification.[14]

The *Koch* court notes that the two-part test thus applies to "disqualification cases *other than* those in which the expert *clear-*

1992).

6. *Pegasus Energy Group v. Cheyenne Pet. Co.*, 3 S.W.3d 112, 121 (Tex.App.-Corpus Christi 1999, pet. denied).

7. *Id.*

8. *See Koch*, 85 F.3d at 1181. I note that absent controlling authority from the Texas Supreme Court, we may look to the Fifth Circuit for guidance. *See Virginia Indon. Co. v. Harris County Appraisal Dist.*, 910 S.W.2d 905, 914 (Tex.1995) (noting "guidance" provided by Fifth Circuit); *Cabla v. State*, 6 S.W.3d 543, 547 (Tex.Crim.App.1999) (noting that regarding issues of first impression, Texas courts look to prior decisions of United States Supreme Court and Fifth Circuit for guidance); *Corkery v. Texas Christian Univ.*, 955 S.W.2d 424, 426 (Tex.App.-Fort Worth 1997, pet. denied) (following Fifth Circuit's guidance in analyzing issue).

9. *Id.; see also, e.g., Turner v. Thiel*, 262 Va. 597, 553 S.E.2d 765, 768 (2001) (adopting and applying two-part test to disqualify expert in medical malpractice case); *Mitchell v. Wilmore*, 981 P.2d 172, 175–77 (Colo.1999) (applying two-part analysis to disqualify car accident reconstruction expert); *Nelson v. McCreary*, 694 A.2d 897, 903–04 (D.C.1997) (applying two-part test to deny disqualification of medical expert who had been paid by both sides, due to lack of confidential or privileged information).

10. *Koch*, 85 F.3d at 1181.

11. *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 277–78 (S.D.Ohio 1988).

12. *Koch*, 85 F.3d at 1181.

13. *Id.*

14. *Id.* (quoting *Wang Lab., Inc. v. Toshiba Corp.*, 762 F.Supp. 1246, 1248 (E.D.Va.1991) (citations omitted) (emphasis added)).

*ly* switched sides." [15] In the present case, Kajima disputes whether Formosa's earlier retention and passage of confidential information occurred. Thus, I would apply the two-part test outlined in *Koch*.[16]

Kajima argues that because Formosa failed to request findings of fact and conclusions of law with regard to the disqualification issue, this Court must presume that the trial court made "implied findings" in support of its judgment. In support of its argument, Kajima cites *Lemons v. EMW Mfg. Co.*, 747 S.W.2d 372, 373 (Tex.1988), *Gutierrez v. Elizondo*, 139 S.W.3d 768, 773 (Tex.App.-Corpus Christi 2004, no pet.), and *Valley Mechanical Contractors v. Gonzales*, 894 S.W.2d 832, 834 (Tex.App.-Corpus Christi 1995, no writ). Those cases stand for the well-settled proposition that in a non-jury trial, where findings of fact and conclusions of law were neither requested nor filed, it will be implied that the trial court made all necessary findings to support its *judgment*.[17] Here, however, Kajima argues that we must defer to the trial court's "implied findings" with respect to the court's denial of Formosa's *motion* to strike Kajima's expert. I am unpersuaded by Kajima's argument.

In any case tried in the district or county court without a jury, any party may request the trial court to state in writing its findings of fact and conclusions of law.[18] Any party may also request additional or amended findings of fact and conclusions of law if he believes the court's findings and conclusions are deficient in some respect.[19] The court must make findings and conclusions on ultimate or controlling issues, but is not required to do so on evidentiary issues.[20] An ultimate fact issue is one that is essential to the right of the action, while an evidentiary issue is one that the jury may consider in deciding the controlling issue, but that is not a controlling issue itself.[21] Here, the issue of whether Kajima's expert witness was disqualified because of alleged "side-switching" was not a controlling issue. Accordingly, it would have been inappropriate for Formosa to request findings of fact and conclusions of law with regard to the issue. I reject Kajima's argument that we must defer to the trial court's "implied findings" on the issue.[22]

Here, the trial court filed a "letter to the file" on October 20, 1995 explaining its reasons for denying Formosa's motion to strike. The court noted that the letter was "not intended as a finding of fact or a conclusion of law" but only as a "brief insight into [its] analysis." The letter stated:

---

**15.** *Id.* (emphasis added). In *Koch*, an insurer retained an expert in an insurance dispute with two other parties. *Id.* After the insurer settled with the two parties, the expert was retained by parties adverse to the insurer. *Id.* Thus, the *Koch* court characterized the case not as one in which the *expert* switched sides, but as one in which the *party* changed its position. *Id.*

**16.** *See id.*

**17.** *See Lemons*, 747 S.W.2d at 373; *Elizondo*, 139 S.W.3d 768, 773; *Gonzales*, 894 S.W.2d 832, 834.

**18.** *See* Tex.R. Civ. P. 296.

**19.** *See* Tex.R. Civ. P. 298.

**20.** *See ASAI v. Vanco Insulation Abatement, Inc.*, 932 S.W.2d 118, 122 (Tex.App.-El Paso 1996, no pet.).

**21.** *Limbaugh v. Limbaugh*, 71 S.W.3d 1, 6 (Tex.App.-Waco 2002, no pet.).

**22.** *See IKB Indus., Ltd. v. Pro–Line Corp.*, 938 S.W.2d 440, 442 (Tex.1997) (noting that when findings of fact are not required but are helpful, they do not have the same weight on appeal as findings made under rule 296 and are not binding on the appellate court).

During our courtroom discussions about the appropriateness of hiring somebody else's witness, we referred to this set of facts as failing to pass the "smell test." Although that doesn't offend me, I think it is an inappropriate concept. For instance, when dealing with cases of first impression, I think a trial court must be cautious, very cautious, in establishing a bright line where none exists, especially if the resulting decision is disqualification. The testimony of former Justice Cook was interesting and, as a guideline for practicing attorneys, is one I would like to follow; however, when advocacy and blurred lines of ethical conduct conflict, it is oppressive to require an attorney to ignore what is good for his client and take the subjective high road. When in doubt, I do not believe a trial court should presume that disqualification is the answer. I would suggest it's the opposite. Consequently, I find myself unwilling to require the Plaintiff to meet the subjective test that may exist in one group's mind. Although the hiring of witnesses previously employed by one side might be perceived as inappropriate, until a clear rule is established before the conduct occurs, it shouldn't be condemned, I'm unwilling to begin the process. One might say it is unfair to hire somebody else's expert, but in the absence of rules clearly prohibiting such acts, it is oppressive to prohibit the use of those experts by opposing counsel. This is especially true when there are ways to protect confidentiality.

I have taken the time to discuss my ruling, but it is not intended as a finding of fact or a conclusion of law. It only illustrates a brief insight into my analysis.

Based on the trial court's comments, I conclude the trial court failed to apply the two-part expert-disqualification test outlined by the Fifth Circuit in *Koch.*

### D. Analysis

I begin by addressing the first part of the two-part test outlined in *Koch:* whether it was objectively reasonable for Formosa to conclude that it had established a confidential relationship with Huyghe and AWH. I conclude that it was.

Kelihar testified at the hearing on Formosa's motion to strike[23] that in 1993, Formosa retained Huyghe and AWH, but that a confidentiality agreement was not considered necessary because Jones Day had "used [Huyghe] as an expert before." The record contains copies of invoices to Jones Day from AWH[24] for services rendered for Formosa, including preparation of a "work plan," compilation of "key project documents," review of "project documentation," and "discussion with staff." The record also contains a copy of a check from Formosa, dated December 21, 1993, in the amount of $20,875.89 to AWH at its Atlanta office for work on the "Kajima case." A January 7, 1994 letter to Huyghe from Formosa refers to invoices from AWH "for services provided to Formosa as requested by Jones, Day, Reavis &

**23.** Attached to Formosa's "Motion to Reconsider Striking Plaintiff's Expert Witness—A. W. Hutchison," filed February 5, 2002 in the 135th District Court of Calhoun County is the statement of facts from the hearing on Formosa's "Motion to Strike Experts," held on October 12, 1995, before the Honorable Michael M. Fricke, presiding judge of County Court-at–Law No. 1 in Calhoun County in trial court cause number 93–CV–29, styled *Kajima Int'l,*

*Inc. v. Formosa Plastics Corp.,* which ended in a mistrial in April 1996. Unless otherwise noted, all references to "testimony" and "the hearing" in this opinion refer to testimony at the October 12, 1995 hearing.

**24.** The invoices are identified as from "A.W. Hutchison & Associates, Inc." at its office in Atlanta, Georgia.

Pogue" and asks about the location of "the work product your company produced." In response, a letter from Huyghe identifies the "work product" produced by the firm as including an "original claims work plan prepared to outline our proposed method for evaluating the performance of Kajima," and an "index and review of documents received to date" from Kajima. An April 15, 1994 letter from Huyghe to an attorney at Porter & Hedges notes that the "initial assignment" to "review and critique Kajima's claim and to research the Formosa records, identifying pertinent documents" has been completed. Based on this evidence, I would hold that it was objectively reasonable for Formosa to conclude that a confidential relationship existed with Huyghe and AWH.

Next, I consider whether Formosa disclosed confidential information to Huyghe. Kelihar testified that in several meetings, she discussed with Huyghe: (1) Formosa's "strategies for this case and what kind of defense we ought to establish;" (2) information gathered from interviews of potential witnesses for Formosa and what testimony such witnesses could provide; (3) which witnesses might be "good" and "bad" for Formosa; and (4) the amount of money Formosa was willing to expend to settle Kajima's claims. A letter dated October 19, 1993 from Huyghe to Jones Day describes AWH's initial budget estimate for additional services based on its "knowledge gained to date" from reviewing Formosa documents and its development of a "claims work plan." The October 19, 1993 letter is labeled "Privileged & Confidential."

Ken Alexander, a partner with Porter & Hedges, testified that on December 3, 1993, following Formosa's transfer of its defense from Jones Day to Porter & Hedges, he met with Huyghe and several of the Jones Day attorneys. At the meeting, Huyghe said he had been retained by Formosa. Alexander understood that Formosa had retained AWH and that Huyghe worked for the firm. Alexander testified that at the meeting, Huyghe made a case for "what A.W. Hutchison had to offer," and said that Chip Hutchison (who later became a testifying expert for Kajima) had "expertise to offer to [Formosa's] lawyers in whatever way it was needed to assist with the defense of the case." Alexander said that they discussed Kajima's claims and "the ways in which we would go about responding to those claims." Alexander said he considered the information exchanged at the meeting confidential. Similarly, at the trial in the present case, Alexander testified that at the meeting, he discussed confidential information with Huyghe, including Formosa's probable defenses to Kajima's claims, evidence that might be developed and had been developed up to that time, matters pertaining to potential witnesses, "strategies," and various other confidential matters.

Kajima argues that no confidential information was shared with Huyghe, and even if it was, that such information cannot be imputed to Hutchison. Kajima points to the fact that Kelihar failed to identify specific confidential documents that Formosa provided to Huyghe and to Huyghe's testimony that in all of his meetings with Formosa's attorneys, he was not exposed to and did not discuss any information he considered confidential. Kajima argues that Huyghe's work for Formosa was limited to the preparation of a document index.

Kajima's arguments are not persuasive. Huyghe's statement that he did not discuss anything with Formosa that he considered confidential is conclusory.[25] Kelihar's un-

---

25. *See In re Amer. Home Prods. Corp.,* 985 S.W.2d 68, 74 (Tex.1998) (conclusory opin-

controverted testimony that Huyghe discussed Formosa's defense strategies, potential witnesses, and willingness to settle establishes that Formosa provided confidential information to Huyghe.[26]

Kajima also argues that even if confidential information was disclosed to Huyghe, the trial court did not err in allowing Hutchison to testify for Kajima because Huyghe was employed by A.W. Hutchison of California, Inc., which was a separate entity from Hutchison's firm, AWH, in Atlanta.[27]

Huyghe's own testimony contradicts Kajima's argument. Huyghe testified that A.W. Hutchison & Associates, Inc. of California and AWH were both owned by Chip Hutchison. At the hearing on the motion to strike, Huyghe also testified as follows:

> Q [Formosa's counsel]: And, again, when you talk about "our professional team," you're including Mr. Chip Hutchison in that, correct?
>
> A [Huyghe]: Yes. We have—our company is broken into divisions. We have an Industrial Division, a team of experts, who have got twenty to thirty years. And—
>
> Q: And, Mr. Chip Hutchison is part of that team of experts, correct?
>
> A: Yes.
>
> . . . .
>
> Q: Okay. If you look down on your little logo and so forth on the bottom there, it says, in big letters, "A.W. Hutchison and Associates, Incorporat-

ed," and, then, you've got, "Atlanta, Los Angeles, Washington, D.C." under that, correct?

> A: Correct.
>
> Q: And, these are all part of A.W. Hutchison and Associates, Inc., correct?
>
> A: Yes.

In addition, Huyghe's June 14, 1993 and October 19, 1993 (marked "Privileged and Confidential") letters to Jones Day and his April 15, 1994 letter to Porter & Hedges were copied to Hutchison.[28] The April 15, 1994 letter states that AWH's initial assignment, which was to review and critique Kajima's claim and to research Formosa records, identifying pertinent documents, has been completed. The letter requests another meeting with Formosa's attorneys for the purpose of discussing in detail AWH's suggestions for resolving and defending against Kajima's allegations. Kelihar testified that Huyghe said that by hiring the firm, Formosa was retaining the option of having Hutchison available to testify, if Formosa so chose. Similarly, Alexander testified that Huyghe represented that Hutchison's expertise was available to Formosa "in whatever way it was needed to assist with the defense of the case." Huyghe testified that he "shared with Chip [Hutchison]" that he had met with several of the Jones Day lawyers who then represented Formosa. Huyghe also testified that he later turned over his "entire project file" regarding the case to Lownds, Kajima's counsel. The file included documents that had been pro-

---

ions of witnesses regarding what is "confidential information" does not raise fact issue).

**26.** *See Koch,* 85 F.3d at 1182 ("confidential information" includes discussion of a party's strategies in litigation, the kind of experts that the retaining party expected to employ, a party's view of the strengths and weaknesses of each side's case, the role of each party's witnesses to be hired, and anticipated defenses).

**27.** *See* footnote 2.

**28.** Huyghe testified that it was "corporate policy" that a copy of "everything that came out of [AWH's California] office" went to AWH's Atlanta office.

vided to Huyghe by Formosa. I conclude that confidential information provided to Huyghe was also provided to Hutchison.

In its motion for rehearing, Kajima argues that this Court's panel opinion in this case [29] erroneously rested on the doctrine of imputed disqualification. Specifically, Kajima asserts that "the majority mistakenly equated expert disqualification with attorney disqualification even though case law disclaims this equation." I emphasize that neither this Court's prior panel opinion nor this dissenting opinion rests on the doctrine of imputed disqualification. Expert disqualification absent strict satisfaction of the two-part test outlined in *Koch* is the minority rule and is fashioned after the rigid standards governing conflicts of interest involving attorneys.[30] As noted above, I agree with the adoption of the two-part expert-disqualification test outlined in *Koch* and have applied it to reach my dissenting opinion in this case.

At the hearing on Formosa's motion to strike, former Supreme Court Justice Eugene Cook testified for Formosa as an expert on rules concerning conflicts of interest and disqualification of experts and the public policy reasons for such rules. Justice Cook provided the following testimony:

Q [Formosa's counsel]: Justice Cook, what is the general rule regarding disqualifications?

A [Justice Cook]: It's really pretty simple. An expert, like an attorney, is not permitted to change sides in the middle of a lawsuit.

Q: Why is that?

A: There's several reasons. Probably, one of the most fundamental reasons is

that it—it adversely effects public confidence in your entire legal system. If the people out there perceive that you can hire an expert and, later, he can change sides, it's going to lower the overall esteem that people have for the lawyers in this Country and, in fact, the entire system of justice. It's fundamentally unfair for one side to hire an expert and for another side to later come in and hire the same expert to testify against them. And, probably, a third reason, this is a very simple reason, if it doesn't pass the smell test. Lawyers and judges are supposed to avoid the appearance of impropriety. This clearly does not pass that smell test.

. . . .

Q: What conclusion have you reached, in your own mind, about whether A.W. Hutchison and Associates has such a conflict of interest that requires disqualification?

A: My opinion is that it has such a disqualification. My opinion is based upon the following factors: First, there was testimony, today, that the settlement authority was disclosed, that the defenses were disclosed. This, clearly, is confidential information. One of the letters from A.W. Hutchison is stamped, "privileged and confidential," which is an admission. In listening to Mr. Huyghe testify, he talked about a short involvement. He talked about a copy of everything that comes out of our file goes to the corporate ... Mr. Chip Hutchison. He talks about the fact that he was paid over Twenty Thousand Dollars. He understood his services would be on hold. And, the original assignment, from what I took down, was to review and critique

---

**29.** *Formosa Plastics Corp., U.S.A. v. Kajima Int'l, Inc.,* No. 13–02–00385–CV, 2004 WL 2534207, 2004 Tex.App. LEXIS 9950 (Tex. App.-Corpus Christi Nov. 10, 2004).

**30.** *See Mitchell v. Wilmore,* 981 P.2d 172 (Colo.1999) (discussing cases).

the Plaintiff's claims. If you allow this sort of conduct to stand and for him to testify, you're going to create serious doubt on the entire integrity of our legal system.

Hutchison's testimony involved all aspects of Kajima's case, including liability, causation, and damages. He testified that Formosa defrauded Kajima, that Formosa knew of significant problems with the drawings before it signed contracts with Kajima, that the problems caused delays, and that the delays resulted in losses to Kajima. Hutchison also testified regarding the method for calculating Kajima's damages. I conclude that Hutchison's testimony was critical to Kajima's case. I would hold that without his testimony, the judgment must be reversed and the case remanded for a new trial.

### III. Justice Castillo's Waiver Argument

Justice Castillo contends that Formosa waived its right to seek disqualification of Hutchison and AWH by failing to assert a claim of confidentiality over information Formosa provided to and the work product created by Huyghe. Justice Castillo argues that "Formosa had at least five opportunities" to establish the confidentiality of information it provided to Huyghe, and that by failing to do so, Formosa waived its right to assert a claim of confidentiality.

Justice Castillo argues Formosa initially failed to address the confidentiality issue at several points during the fall of 1993 when Huyghe was performing work for Formosa at the request of Jones Day. According to Justice Castillo, Formosa missed a fourth "opportunity" when it transferred its defense from Jones Day to Porter & Hedges in December 1993, and

Porter & Hedges failed to clearly establish confidentiality over information provided to and work product created by Huyghe. Finally, Justice Castillo argues, Formosa missed its fifth "opportunity" when it failed to object after "Huyghe reported the initial contact by Kajima."

With respect to Formosa's failure to address the confidentiality issue with Huyghe at the outset, I note that Kelihar testified at the hearing on Formosa's motion to strike that in 1993, Formosa retained Huyghe and AWH in connection with the Kajima lawsuit. She also testified that it "wasn't necessary for us to enter into a confidentiality agreement with [Huyghe] before we disclosed confidential information" because Jones Day had "used [Huyghe] as an expert before."

With regard to the fourth "opportunity," when Porter & Hedges assumed Formosa's defense, Alexander testified he understood that AWH had been retained by Formosa and that Huyghe worked for the firm. He also testified that until he learned in late September 1995 that Kajima had named Hutchison as its expert, he believed Formosa still retained the option of using Hutchison in whatever capacity it chose.[31]

Justice Castillo contends Formosa missed a fifth "opportunity" when it failed to object after Huyghe "reported the initial contact by Kajima." The record reflects, however, that in 1994, Huyghe "reported" that he had been contacted by Kajima only to Kelihar at Jones Day, Formosa's *former* counsel. Kelihar testified that Huyghe said he had been approached by Kajima to be an expert and asked her opinion regarding whether the work he and the firm had earlier performed for Formosa could result in a conflict. Keli-

**31.** Alexander also testified at the present trial (in February 2002) that after Porter & Hedges assumed Formosa's defense, he had several telephone conversations with Huyghe involving confidential information.

har told Huyghe she thought he "knew some things that … would make it difficult for him to represent the other side" and that he should contact Porter & Hedges. Huyghe admitted that he never called Porter & Hedges to let Formosa know that AWH had signed up with Kajima. Formosa learned that Hutchison and Brian Rogers (also of AWH) had been designated as Kajima's testifying experts on September 19, 1995, when Formosa received Kajima's supplemental interrogatory responses. Approximately two weeks later, on October 4, 1995, Formosa filed its motion to strike. The trial court held a hearing on Formosa's motion on October 12, 1995.

By filing its motion to strike only a few weeks after learning of Kajima's designation of experts, Formosa preserved its right to seek disqualification of Hutchison and AWH.[32]

### IV. Conclusion

I would hold Formosa met its burden of establishing that: (1) it reasonably concluded that it had a confidential relationship with Huyghe and AWH; and (2) it disclosed confidential information to Huyghe and AWH.[33] Accordingly, I would hold that the trial court abused its discretion in refusing to disqualify Hutchison as an expert witness for Kajima. I would reverse the judgment of the trial court and remand this case for a new trial in which Hutchison would not be permitted to testify as an expert witness.

---

**32.** *See In re Amer. Home Prods. Corp.*, 985 S.W.2d at 73 (delay of less than two months in filing motion to disqualify counsel did not constitute waiver of right to disqualify) (citing *Rio Hondo Implement Co. v. Euresti*, 903 S.W.2d 128, 131 (Tex.App.-Corpus Christi 1995, orig. proceeding) (holding that two and one-half month delay does not constitute waiver of right to disqualify)).

